THE STATE OF OHIO, APPELLEE, *v.* GOINES, APPELLANT.

(No. 1908—Decided April 10, 1984.)

*Mr. Albert Stewart, Jr.,* city prosecutor, for appellee.

*Mr. Stephen E. Schutte,* for appellant.

BROGAN, P.J. Defendant Russell Goines pleaded no contest in the Springfield Municipal Court to a charge of driving while his license was suspended, in violation of R.C. 4507.38. The court found him guilty, and judgment and sentence were thereupon entered.

Defendant has appealed to this court, asserting as his sole assignment of error:

"The court erred in not granting appellant's motion to suppress the evidence which indicated that appellant was driving under a suspension in that the inquiry as to his driving license status exceeded the scope of inquiry allowed pursuant to a safety inspection."

On June 8, 1983, state trooper Dale Horvath and a fellow trooper were conducting a safety check of motor vehicles traveling westbound on Dayton Road near the west corporation limits of Springfield. The purpose of stopping the automobiles was to check for their safe operation. The state trooper indicated that his standard routine during a safety inspection would include examining the motor vehicle's tires, headlights, and other mechanical operations of the auto to see if they were in proper operating condition. Additionally, examination of the driver's license was part of the routine check. The purpose for examining the license was to check to see if the license was current or under suspension.

Trooper Horvath testified, on direct examination:

"Q. Please explain to the court where the stop took place and what happened.

"A. We were, the other officer and myself, were holding a random motor vehicle inspection. * * *
"* * *

"Q. When you say random, what do you mean by that?

"A. That it's not we were holding up every car that went by. It was a random inspection.
"* * *

"Q. And did you have occasion to stop Mr. Goines at that time?

"A. Yes, sir, I did.

"Q. And that was for what?

"A. To inspect his vehicle.

"Q. Please explain to the Court in this particular case how did you go about inspecting this vehicle. What's the standard procedure you use * * * [;] did you use [it] in this case?

"A. Yes, sir. We attempt to inspect as many vehicles in a location as we can. I had just completed one and had observed the defendant coming westbound out of town towards me, and I flagged him in.
"* * *

"A. From what I recall, I don't believe the defendant had his driver's license with him. And then we ran him through the computer and it came back that he was and is still currently under suspension to the Springfield Municipal Court.

"Q. And you charged him with that accordingly, is that correct?

"A. Yes, sir."

Defendant's motion to suppress the evidence that he was driving under suspension, discovered as a result of the stop, was overruled by the trial court.

In *Delaware* v. *Prouse* (1979), 440 U.S. 648, 653-654, the United States Supreme Court stated that the Fourth and Fourteenth Amendments are implicated in these types of cases because stopping an automobile and detaining its occupants constitutes a seizure, "even though the purpose of the stop is limited and the resulting detention quite brief. * * * The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by gov-

ernment officials, including law enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions * * *." ' *Marshall* v. *Barlow's, Inc.*, 436 U.S. 307, 312 (1978), quoting *Camara* v. *Municipal Court*, 387 U.S. 523, 528 (1967). * * *"

The court used a balancing test to weigh the competing interests of highway safety and an individual's reasonable expectation of privacy in his car. Although the state's interest in highway safety was legitimate, the court held that the unbridled discretion of a police officer to stop motor vehicles randomly was violative of the Fourth Amendment protections. The court reasoned that:

"* * * [T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field,' * * *." *Id.* at 654-655.

When examining the procedure used during a randon stop of a motor vehicle, the court pointed out that any stop of another vehicle would make the individual subject "to a show of the police power of the community[,]" "may create substantial anxiety" and "interfere with freedom of movement, are inconvenient, and consume time." *Id.* at 657. The effect of a random spot check on individual's privacy interest, weighed against the discretion of a police officer to conduct a spot check, lead the court to conclude that:

"* * * When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations — or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered — we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. * * *" *Id.* at 661.

The Supreme Court therefore held:

"* * * that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion *or that do not involve the unconstrained exercise of discretion.* Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with *at the unbridled discretion of police officers.* * * *" (Emphasis added.) *Id.* at 663.

The Iowa Supreme Court concluded in *State* v. *Hilleshiem* (1980), 291 N.W. 2d 314, at 318, after review of *Prouse* and other pertinent cases, that:

"* * * Where there is no consent, probable cause, or *Terry*-type reasonable and articulable suspicion, a vehicle

stop may be made only where there minimally exists (1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to 'show * * * the police power of the community;' and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria.''

R.C. 4513.02 provides, in pertinent part:

"(A) No person shall drive or move, or cause or knowingly permit to be driven or moved, on any highway any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person.

"(B) When directed by any state highway patrolman, the operator of any motor vehicle shall stop and submit such motor vehicle to an inspection and such tests as are necessary to determine whether it is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair, or in violation of the equipment provisions of Chapter 4513 of the Revised Code.

"Such inspection shall be made with respect to the brakes, lights, turn signals, steering, horns and warning devices, glass, mirrors, exhaust system, windshield wipers, tires, and such other items of equipment as designated by the superintendent of the state highway patrol by rule or regulation adopted pursuant to sections 119.01 to 119.13 of the Revised Code.

"Upon determining that a motor vehicle is in safe operating condition and its equipment in conformity with Chapter 4513 of the Revised Code, the inspecting officer shall issue to the operator an official inspection sticker, which shall be in such form as the superintendent prescribes except that its color shall vary from year to year.

"(C) The superintendent of the state highway patrol, pursuant to sections 119.01 to 119.13 of the Revised Code, shall determine and promulgate standards for any inspection program conducted by a political subdivision of this state. * * *''

Insofar as R.C. 4513.02(B) would permit the random stop of automobiles, it must be read in conjunction with *Delaware* v. *Prouse, supra.* We note in addition that the Lucas County Court of Appeals cases *State* v. *Reiger* (1978), 63 Ohio App. 2d 135 [17 O.O.3d 332], and *State* v. *Benson* (Feb. 18, 1983), Lucas App. No. L-82-253, unreported, dealt with R.C. 4513.02(B) and *Prouse* as they relate to commercial freight vehicles, and not automobiles as in this case. Therefore, *Reiger* and *Benson* do not impact on this case.

While the facts in the matter *sub judice* are sparse, they bear little resemblance to the facts before the Supreme Court in *Delaware* v. *Prouse, supra.* In the latter case, the police officer characterized his stopping of the respondent's car as "routine." The police officer explained, " 'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.' " *Prouse, supra,* at 650-651.

Despite the unfortunate characterization by the trooper that his stop of the appellant's care was "random," the facts suggest the stopping was not an unbridled act of whim, but was part of a calculated pattern of inspecting automobiles at a designated checkpoint. He stated that after he had completed the inspection of one vehicle, he flagged down the next available motorist, who happened to be the appellant.

While the Supreme Court in *Prouse* held that a roadblock inspection scheme clearly would pass constitutional muster, we do not believe the decision

rules out inspection "checkpoints" which, due to limited manpower, permit only some passing vehicles to be inspected.

The touchstone of the Fourth Amendment is "reasonableness." Is the conduct of the police officer reasonable in light of all the circumstances? Privacy interests of all citizens must at times be surrendered to reasonable demands of society, *e.g.,* public safety. *United States* v. *Villamonte-Marquez* (1983), 77 L. Ed. 2d 22.

In *United States* v. *Martinez-Fuerte* (1976), 428 U.S. 543, the Supreme Court held that border patrol officers may stop vehicles and question their occupants at fixed checkpoints without probable cause or reasonable suspicion. The court held that fixed checkpoints have two major advantages, for Fourth Amendment purposes, over roving patrols: they decrease somewhat the intrusiveness of the stop, and they significantly channel and limit the discretion of the officers and the consequent potential for abuse. The court stated at 558:

"* * * [W]e view checkpoint stops in a different light because the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less in the case of a checkpoint stop. * * *"

The court further reasoned, at 559:

"* * * [C]heckpoint operations both appear to and actually involve less discretionary enforcement of activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or

oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. * * *"

The assignment of error is accordingly overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

KERNS and WEBER, JJ., concur.