The STATE of Ohio, Appellant,

v.

BAUER, Appellee.

[Cite as *State v. Bauer* (1994), 99 Ohio App.3d 505.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 94APC03–446.

Decided Dec. 27, 1994.

*Ronald J. O'Brien,* City Attorney, *David M. Buchman* and *Brenda J. Keltner,* Assistant City Attorneys, for appellant.

*Dennis P. Evans,* for appellee.

DESHLER, Judge.

Appellant, the state of Ohio, appeals from a decision of the Franklin County Municipal Court granting appellee Terry Bauer's motion to suppress all evidence obtained from the stop of appellee's vehicle at a sobriety checkpoint.

Appellee was charged with driving under the influence of alcohol after being stopped at a sobriety checkpoint conducted by the Worthington Police Department on the night of September 4–5, 1993. Appellee moved to suppress on the basis that the checkpoint was established and operated in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution. The trial court held a hearing on the motion on November 24, 1993, and the parties stipulated the testimony of Worthington Police Chief, Wayne McCoy, and Worthington Police Sergeant, Rob Oppenheimer.

The testimony of the officers set forth the following pertinent facts: Chief McCoy became interested in implementing a sobriety checkpoint program with the twin goals of increasing public awareness of impaired driving and deterring drunk drivers from taking to the roads both specifically in the Worthington area and Franklin County. Chief McCoy attended a sobriety checkpoint training program conducted by the Ohio State Highway Patrol and attended checkpoints conducted by other agencies in Ohio in order to observe and learn from the actual

operation. Based upon his training and experience, Chief McCoy established extensive and detailed procedures for conducting the proposed sobriety checkpoint.

The checkpoint in question was located on S.R. 161 near Thomas Worthington High School, in a location which allowed for safe traffic control and, based upon department research of OMVI arrest histories, provided a high likelihood of intercepting impaired drivers attempting to avoid more visible routes across town.

The physical layout of the checkpoint provided for distant signage warning of the sobriety checkpoint ahead. A police car was stationed at the entry to the checkpoint with flashing lights and permanently burning flares. After the initial warning by signage, but before drivers reached the checkpoint greeting station, a pickup truck displaying an arrow directed traffic into a single lane. Beyond the truck a side street intersecting with S.R. 161 provided an avoidance route for drivers wishing to avoid going through the checkpoint. Beyond this, drivers were met by officers serving as "greeters," who advised the driver that they were entering a sobriety checkpoint and forwarded them to "checking teams." One member of the checking team would ask for the driver's license and perform a rapid horizontal gaze nystagmus test ("HGN") if the officer was so certified, or employ a portable breath analyzer ("PBA") to supplement the officer's personal observations of potential intoxication. If indices of alcohol use were noted, the vehicle would be sent to a diversion area, where another team of officers would perform more extensive standard field sobriety tests.

Chief McCoy established a traffic delay time for a given vehicle of forty-five seconds as the goal of the operation, with a maximum permissible delay of three minutes, and testified that no vehicle was detained beyond this time on the night in question. In order to meet the traffic delay goal, Chief McCoy would establish a stop ratio by which a set proportion of vehicles would be waved through the checkpoint and the balance processed through according to a fixed pattern. A typical pattern, the chief testified, would involve stopping two vehicles, waving the next five through and then repeating the pattern, to give a random stop ratio of two cars in seven. As traffic volume decreased through the night, Chief McCoy, after a delay in order to ensure that the traffic decrease was not due only to a temporary lull, would increase the proportion of cars stopped. By the time appellee reached the checkpoints, all vehicles passing through the checkpoint were being checked. Chief McCoy was present and in command of the checkpoint throughout its hours of operation between 10:00 p.m. and 4:00 a.m.

Approximately four to six weeks prior to the scheduled time of the checkpoints, a general public awareness campaign of the impending checkpoint program was initiated. Information was provided to both local suburban newspapers. Thirty-

six hours prior to the checkpoint in question, a news release with the exact location of the checkpoint was faxed to all local newspapers, radio stations, and television stations. Two local papers carried information on the planned Worthington checkpoint, and the countywide Columbus Dispatch carried general coverage of this and other checkpoints being conducted by local agencies.

The trial court found three bases for suppressing evidence against appellee on constitutional grounds. The trial court found that Chief McCoy exercised too much discretion in his ability to change the pattern of random stops and, thus, was not a neutral detached supervisor. The trial court also concluded that the use of a portable breath-analyzer device as part of the initial traffic stop was excessively intrusive. Finally, the trial court found that the advance publicity afforded to the sobriety checkpoint was insufficient to serve two goals of the checkpoint: (1) to deter impaired drivers from taking to the road, and (2) to reduce the fear or surprise encountered by a law-abiding motorist when confronted with a sobriety checkpoint. The chief defect in the advance publicity, according to the trial court, was the absence of a timely disclosure or release of specific information regarding the location of the checkpoint in the countywide and local newspapers.

The appellant has timely appealed and brings the following single assignment of error:

"The trial court erred in determining that the Worthington sobriety checkpoint was unreasonable and in violation of Section 14, Article I of the Ohio Constitution and the Fourth Amendment of the United States Constitution."

The United States Supreme Court has unequivocally stated that a checkpoint or roadblock stop is a "seizure" for purposes of Fourth Amendment analysis. *United States v. Martinez–Fuerte* (1976), 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116; *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. In *Prouse,* the court stated:

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order to 'safeguard the privacy and security of individuals against arbitrary invasions.' *Marshall v. Barlow's, Inc.* (1978), 436 U.S. 307, 312, [98 S.Ct. 1816, 1820, 56 L.Ed.2d 305, 311], quoting *Camara v. Municipal Court* (1967), 387 U.S. 523, 528 [87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935]." *Prouse,* 440 U.S. at 653–654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667.

The court further stated, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amend-

ment interests against its promotion of legitimate governmental interests." *Id.*, 440 U.S. at 654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667–668.

In *Brown v. Texas* (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357, the Supreme Court specifically addressed the reasonableness of seizures less intrusive than a traditional arrest, and sought to establish criteria for balancing the public interest and an individual's right to personal security free from arbitrary interference by authorities. The court established such a test in the following language:

"Consideration of the constitutionality of such seizures involves weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

"A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. * * * To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." (Citations omitted.) *Id.* at 50–51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362.

An Ohio appellate court, seeking to apply and elaborate upon the *Brown* test in the context of a safety roadblock, applied the following guidelines:

" ' * * * Where there is no consent, probable cause, or *Terry*-type reasonable and articulable suspicion, a vehicle stop may be made only where there minimally exists (1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to "show * * * the police power of the community;" and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria.' " *State v. Goines* (1984), 16 Ohio App.3d 168, 170–171, 16 OBR 178, 180, 474 N.E.2d 1219, 1221–1222, quoting *State v. Hilleshiem* (Iowa 1980), 291 N.W.2d 314, 318.

The United States Supreme Court specifically applied the *Brown* standard to seizures resulting from sobriety checkpoints in *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412. As in the case before us, the court in *Sitz* addressed "only the initial stop of each motorist passing

through a checkpoint and the associated preliminary questioning and observation by checkpoint officers." Detention of selected motorists for more extensive field sobriety testing continues to require satisfaction of an individualized suspicion under *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and its progeny. The court found that the severity of the drunken driving problem on United States highways, and the states' interests in combating it, was beyond question. "Conversely, the weight bearing on the other scale—the measure of the intrusion on motorists stopped briefly at sobriety checkpoints—is slight." *Id.,* 496 U.S. at 451, 110 S.Ct. at 2486, 110 L.Ed.2d at 421.

■ We therefore approach our analysis of the case before us on the basis that a sobriety checkpoint which does not exceed the constitutionally permissible level of intrusiveness on motorists will comply with the Fourth Amendment to the United States Constitution. We conclude at the outset, based upon *Sitz,* that prevention of drunk driving serves a public concern of sufficient gravity that carefully limited interference with personal liberty is warranted, thus meeting the first prong of the *Brown* test. Because the roadblock in the present case produced an arrest ratio of over two percent (ten cars out of approximately four hundred sixty-five stopped), or significantly higher than in *Sitz,* we also conclude that the public interest was unquestionably advanced in an effective manner by the roadblock, thus meeting the second prong of *Brown.*

■ We will first address appellee's contention that Chief McCoy exercised unbridled discretion as the supervising officer at the checkpoint in determining which vehicles would be selected to be stopped because Chief McCoy participated both in formulating the guidelines and carrying them out as a field officer.

As for Chief McCoy's participation as a "field officer" at the checkpoint, we do not believe the record actually supports the inference drawn by appellee that the chief personally participated as a checking officer dealing with motorists at the checkpoint. Appellee supports this inference by citing the testimony of Sgt. Oppenheimer, who stated:

"About 2:15, 2:20, we had a large number of arrests, and all the patrolmen were pulled off the line to the diversion area and to the police department with arrests. I was left—Myself, Chief McCoy and, I believe, a Westerville police officer was all that was left, and I was checking cars at that time."

This statement is at best ambivalent regarding whether Chief McCoy personally participated in checking stopped motorists and can be more clearly understood as a simple explanation why Oppenheimer, as checkpoint line commander, was personally checking vehicles himself due to a shortage of manpower. Furthermore, Chief McCoy's direct testimony was as follows:

"Q: Were you participating as a checker or were you commanding the operation?

"A: No, I was not. I was just commanding the operation as in general, dealing with news media and watching what went on."

It therefore does not appear from the record that Chief McCoy was functioning both as a policy maker and as a field officer of the checkpoint scene.

Moreover, even if this were the case, we do not find that it would necessarily be fatal to the constitutionality of the checkpoint under a *Brown* analysis. Chief McCoy, based upon State Highway Patrol training and attendance at other roadblocks, established a neutral and objective standard for stopping vehicles based upon impedance of traffic flow and duration of stops. Through the night, as traffic decreased, the proportion of vehicles pulled over increased until every vehicle was being stopped. Although Chief McCoy did not document the traffic rates which prompted the increase in stops, he did document the times at which the ratio of vehicles stopped to vehicles waved through was changed, and the resulting new stop ratios established. The entire scheme for determining which vehicles would be stopped was based upon neutral and objective criteria as required by *Brown*, and appears to have been adhered to throughout the evening. With these neutral and objective guidelines in place, even if Chief McCoy had personally participated in the stopping of vehicles, it would not necessarily follow that he was exercising unbridled discretion as long as he adhered to the previously established guidelines and complied with ratios based upon traffic flow and vehicle delay.

Based upon the foregoing, we find that the trial court erred in concluding that Chief McCoy exercised excessive discretion in selecting which motorists would be stopped at the checkpoint.

■ Appellee further argues that the checkpoint was constitutionally invalid because of the excessive intrusion on motorists confronted by the use of a PBA at the initial checking point. As outlined in the testimony of the officers, checking officers employed either a brief HGN test, if they were so trained, or a PBA check to determine possible intoxication by a driver. The maximum length of detention was set at three minutes, and the average delay was forty-five seconds. The Supreme Court in *Sitz* did not establish precise limits to the length and procedure employed at an initial checkpoint stop, but spoke generally in terms of *objective* intrusion, measured by the duration and intensity of activity as a consequence of the stop, and *subjective* intrusion based upon the potential for fear and surprise of the stopped motorists. Since the objective intrusion of brief questioning was found acceptable in *Sitz*, we do not believe the intrusion here,

involving the HGN or PBA testing, is sufficiently different in form or duration to invalidate the process from a constitutional standpoint.

We are mindful that at least one Ohio appellate court has upheld suppression in a checkpoint arrest when the delay imposed on motorists was substantially longer than in *Sitz*, and the scope of the inquiry was not limited to a detection of apparent intoxication. *State v. Blackburn* (Mar. 23, 1994), Clark App. No. 2084, unreported, 1994 WL 95224. The same Second Appellate District, however, one month later, upheld a checkpoint and distinguished its prior decision on the basis that the brief administration of an HGN test and distribution of an informational leaflet constituted an acceptable level of investigation under *Sitz*. *State v. Kelley* (Apr. 13, 1994), Greene App. No. 93CA–57, unreported, 1994 WL 124825. We believe that the case before us is more closely comparable to *Sitz* and *Kelley*, because the scope of inquiry was more limited to impaired driving.

The degree of "subjective" intrusion, as described in *Sitz*, relates to the apprehension experienced entering the checkpoint. The Supreme Court, in *Sitz*, was careful to point out that "the 'fear and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.*, 496 U.S. at 452, 110 S.Ct. at 2486, 110 L.Ed.2d at 421. In measuring the potential subjective impact upon motorists of the checkpoint, we find useful the first three elements of the test set forth by the Iowa Supreme Court and relied upon in *Goines, supra:* checkpoint safety and visibility, advance warning signs, and uniformed officers and official vehicles in sufficient quantity to clearly indicate official police involvement in the roadblock. As described in the testimony of the officers, the checkpoint in question here appears to have possessed all of these qualities in ample quantity to allay motorists' apprehension about the nature of the stop.

On either a subjective or objective basis, we do not believe the degree of intrusion generated by the checkpoint was sufficient to outweigh the clearly defined state interests at issue, and the minimal increase of intrusiveness of employment of the HGN or PBA test, as opposed to simple questioning as found in *Sitz*, is insufficient to distinguish *Sitz* from the case before us. We therefore find that the trial court erred in concluding that the use of a PBA analyzer at the checkpoint was violative of the Constitution.

■ Finally, appellee argues that there was a lack of actual and substantial publicity regarding the checkpoint because the police notices to local newspapers were not timely and contained insufficient information regarding the location and time of the checkpoint. We do not find that any of the decisions on this issue set forth a requirement of actual precheckpoint publicity. The Supreme Court in *Sitz* noted that the checkpoint program had advance publicity, but gave no

further mention of the matter in its analysis.  We cannot infer from this that any publicity whatsoever, let alone specific announcements of time, date, and place, is required for sobriety checkpoints under the Constitution.  The requirement for precheckpoint publicity, if it exists, relates to the aforementioned subjective intrusion experienced by motorists stopped at the checkpoint.  If the signage and police presence convey a clear message of the legitimate authority present at the checkpoint, it might be that no advance publicity is necessary.  In the case before us, *general* precheckpoint publicity, even without specific notice of time and place, would serve to alert the driving public to the potential for sobriety checkpoints to be encountered on the roads, and promote rapid recognition by motorists arriving at one of these checkpoints.  We find that if the information disseminated by the police department in this case to local media did not contain all the specifics of the checkpoint locations and duration, this does not render the checkpoint unconstitutionally intrusive.  We therefore conclude that the trial court erred in finding that the checkpoint was constitutionally invalid because of the lack of precheckpoint publicity.

Finally, we address the trial court's finding that the Ohio Constitution provides no wider prohibition against search and seizure in these circumstances than that found in the Fourth Amendment to the United States Constitution.  We agree.

States are free to construe their own constitutions more stringently than the federal Constitution.  *California v. Greenwood* (1988), 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30.  The Ohio Supreme Court has noted, however, the "virtually identical" wording of the applicable Ohio and federal provisions [1] and has previously declined to impose a more stringent Ohio standard.  *State v. Geraldo* (1981), 68 Ohio St.2d 120, 125, 22 O.O.3d 366, 369, 429 N.E.2d 141, 145 (warrantless monitoring of telephone conversations).  A more recent case, *State v. Brown* (1992), 63 Ohio St.3d 349, 588 N.E.2d 113, reveals some inclination that a more stringent interpretation *might* be accorded to the Ohio provision in some instances;  that is not, however, the holding of the case.  In the absence of case law developed on this issue, we find no reason, on the facts before us, to initiate

---

1.  The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Section 14, Article I of the Ohio Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated;  and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

such a distinction between the search and seizure provisions of the Ohio and federal Constitutions as to sobriety checkpoints.

Based upon the foregoing, appellant's assignment of error is sustained. The decision of the Franklin County Municipal Court ordering suppression of evidence obtained subsequent to appellee's checkpoint stop is hereby reversed, and this matter is remanded to the trial court for further proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

PEGGY BRYANT and TYACK, JJ., concur.