OPINION JUDGMENT ENTRY
{¶ 1} Defendant-appellant, Cynthea A. Hall, appeals from her conviction and sentence in the Ashland Municipal Court, for one count of Operating a Motor Vehicle While Under the Influence, a misdemeanor of the first degree, in violation of R.C. 4511.19
(A)(3). The plaintiff-appellee is the State of Ohio.
 {¶ 2} On June 25, 2003, a sobriety checkpoint was conducted on State Route 3 in the Village of Loudonville, Hanover Township, Ashland County, Ohio. The check point involved members of the Ohio State Highway Patrol, the Ashland County Sheriff's Department, the Loudonville Police Department and the Perrysville Police Department.
 {¶ 3} The site for the checkpoint was chosen due to a high number of alcohol related incidents. A study of the location, including aerial photograph and sketches of the layout of the checkpoint, were completed prior to conducting the checkpoint.
 {¶ 4} A police observation car was stationed to the north and to the south of the checkpoint location. "Sobriety Checkpoint Ahead" signs were placed more than 750 feet in advance of the location of the checkpoint. "Slow and Prepare to Stop" signs along with arrow boards directing cars to the appropriate lane were also in place. Additionally, two roads, one northbound and one southbound were available for drivers wishing to avoid the checkpoint area.
 {¶ 5} The two center lanes of State Route 3 were cordoned off to be used as the diversion area. A uniformed officer would direct on-coming vehicles into the area to speak with another officer who was acting as a "checker".
 {¶ 6} A system for checking cars was established. Every car was to be checked, unless traffic backed up to the point that cars were becoming a safety hazard. At that time, the zone would be "flushed" in that a pre-determined amount of time or number of vehicles would be allowed to go through the zone without stopping. The officers would then return to stopping all vehicles when the checkpoint was clear.
 {¶ 7} Prior to the checkpoint being conducted on July 25, 2003, three notices were sent out by law enforcement to local news media. The first was sent to newspapers, news stations and radios advising that a checkpoint would be conducted. The second notice was sent no later than 24 hours in advance giving general information as to the county in which the checkpoint would be held. The final notice was sent no earlier than 6 hours prior to the beginning of the checkpoint. That notice gave the actual location of the checkpoint.
 {¶ 8} On the night of the checkpoint a briefing was held with law enforcement officers. Officers were instructed to stop every car and make contact with the driver. If no alcohol involvement was detected, the officer would give the driver a card with information about the checkpoint. The interaction between the officer and the driver lasted no more than one minute.
 {¶ 9} The appellant's vehicle was stopped after she failed to stop in accordance with the traffic signs and police officers signaling her to do so. Appellant was ultimately arrested and charged with Operating a Motor Vehicle Under the Influence in violation of R.C. 4511.19. Appellant filed a motion to suppress in the trial court challenging the constitutionality of the sobriety checkpoint. After a hearing the trial court overruled appellant's motion. Appellant thereafter pled no contest to the charge and timely appealed.
 {¶ 10} As her sole assignment of error, appellant states:
 I {¶ 11} "The trial court erred in finding that the sobriety Checkpoint was constitutional under the fourth amendment to the united states constitution and article 1, § 14 of the ohio constitution."
 {¶ 12} In her sole assignment of error the appellant maintains that the checkpoint in the case at bar was unconstitutional. The appellant advances several reasons for invalidating the checkpoint. First, the State failed to properly publicize the checkpoint in advance of its operation. Second, not all vehicles traveling in the path of the checkpoint were subjected to the stop. Third, the State failed to show the government interest outweighed the privacy rights of the motorists. Finally, the record contains no evidence of the effectiveness of the checkpoint.
 {¶ 13} The United States Supreme Court has unequivocally stated that a checkpoint or roadblock stop is a "seizure" for purposes of Fourth Amendment analysis. United States v.Martinez-Fuerte (1976), 428 U.S. 543, 96 S.Ct. 3074; Delawarev. Prouse (1979), 440 U.S. 648, 99 S.Ct. 1391.
 {¶ 14} In Michigan v. Sitz(1990), 496 U.S. 444, 453,110 S.Ct. 2481, 2485, the United States Supreme Court specifically applied the balancing analysis set forth in Brown v. Texas
(1979), 443 U.S. 47, 99 S.Ct. 2637 and held that a state's use of a highway sobriety checkpoint does not per se violate theFourth Amendment to the United States Constitution. The roadblock challenged in that case was established pursuant to a sobriety checkpoint pilot program developed by the Michigan Department of State Police. As provided under the guidelines, all vehicles passing through the checkpoint were stopped and their drivers briefly examined for signs of intoxication. In cases where a checkpoint officer detected signs of intoxication, the motorist was directed to a location out of the traffic flow where an officer checked the motorist's drivers' license and registration and, if warranted, conducted further sobriety tests and made an arrest. All other drivers were permitted to resume their journey. The checkpoint was operated for 75 minutes, during which 26 vehicles were stopped. The average delay was 25 seconds for each vehicle. Two motorists were detained for field sobriety testing and one was arrested. Id.
 {¶ 15} A majority of state courts have followed the balancing analysis and have concluded that roadblocks may survive constitutional scrutiny if they are operated under guidelines which minimize intrusiveness and limit officers' discretion. See,State v. Downey (Tenn.Sup.Ct., 1997), 945 S.W.2d 102, 108 at n. 6.
 {¶ 16} We recognize the State's compelling interest in detecting and deterring motorists who drive while under the influence of alcohol. The statistics are overwhelming. As the court noted in Sitz, more deaths and injuries have resulted from such motor vehicle accidents on our nation's highways than from all the wars this country has fought. 496 U.S. at 456,110 S.Ct. at 2488 (Blackmun, J., concurring).
 {¶ 17} We, therefore, join the majority of jurisdictions who have concluded that the use of a sobriety roadblock may be used to advance the State's compelling interest provided it is established and operated in a manner that minimizes intrusion and limits discretion. Such roadblocks do not violate the Ohio Constitution. State v. Eggleston (1996), 109 Ohio App.3d 217,671 N.E.2d 1325; State v. Bauer (1994), 99 Ohio App.3d 505,651 N.E.2d 46.
 {¶ 18} In determining whether a checkpoint passes constitutional muster the Clark County Court of Appeals developed the following guidelines:
 {¶ 19} "`* * * Where there is no consent, probable cause, or Terry-type reasonable and articulable suspicion, a vehicle stop may be made only where there minimally exists (1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to "show * * * the police power of the community;" and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria.' "State v. Goines (1984), 16 Ohio App.3d 168, 170-171,474 N.E.2d 1219, 1221-1222, quoting State v. Hilleshiem (Iowa 1980), 291 N.W.2d 314, 318.
 {¶ 20} In the case at bar, the testimony established that an advanced decision was made concerning the safety of the location of the roadblock, which included aerial photography and drawings as to the layout of the checkpoint. (T. at 9; 12-13). Accordingly, the first factor of the Goines test had been met.
 {¶ 21} The evidenced further established that observation police cars were stationed to the north and to the south of the checkpoint area. (T. at 11). "Sobriety Checkpoint Ahead" signs were placed more than 750 feet from the checkpoint. (Id). "Slow and Prepare to Stop" signs, along with arrow boards directing cars into the appropriate lanes were also in place. (Id. at 11-12). A crossroad in each direction for individuals to turn if they wished to avoid the checkpoint was also included in the design of the checkpoint. (Id. at 10). Accordingly the second factor of the Goines test has been met.
 {¶ 22} Along with the signage as noted above, the center two lanes were cordoned off as the diversion area. (T. at 14). A uniformed police officer waived the oncoming vehicles up to the "checkers" who were also uniformed police officers. (T. at 20; 32). Additionally, advanced notice was given via TV, radio and newspapers in Ashland County warning that checkpoints would be conducted. (T. at 15). Appellant's argument that the media were not located in the specific location of the checkpoint is unpersuasive. In State v. Bauer (1994), 99 Ohio App.3d 505,651 N.E.2d 46, the court noted "[w]e do not find that any of the decisions on this issue set forth a requirement of actual pre-checkpoint publicity. The Supreme Court in Sitz noted that the checkpoint program had advance publicity, but gave no further mention of the matter in its analysis. We cannot infer from this that any publicity whatsoever, let alone specific announcements of time, date, and place, is required for sobriety checkpoints under the Constitution. The requirement for pre-checkpoint publicity, if it exists, relates to the aforementioned subjective intrusion experienced by motorists stopped at the checkpoint. If the signage and police presence convey a clear message of the legitimate authority present at the checkpoint, it might be that no advance publicity is necessary. In the case before us,general pre-checkpoint publicity, even without specific notice of time and place, would serve to alert the driving public to the potential for sobriety checkpoints to be encountered on the roads, and promote rapid recognition by motorists arriving at one of these checkpoints. We find that if the information disseminated by the police department in this case to local media did not contain all the specifics of the checkpoint locations and duration, this does not render the checkpoint unconstitutionally intrusive. We therefore conclude that the trial court erred in finding that the checkpoint was constitutionally invalid because of the lack of pre-checkpoint publicity." Id. at 512-13,651 N.E.2d at 51.
 {¶ 23} The third prong of the Goines analysis has been met.
 {¶ 24} The trooper in the case at bar testified that "[a] very extensive report was prepared with all of the statistical information included, how it was going to be run, exactly where it was going to take place, officers involved. Everything was put together in a report, and then submitted through district staffing to general headquarters." (T. at 8). General headquarters had the ultimate decision making authority. (Id.). The fact that the officers did not stop every car does not show a random stopping or a stopping of only selective vehicles based upon the unbridled discretion of the officers. In this case the trooper testified that every car was stopped "unless traffic became to the point where we were backing cars up and it became a safety hazard." (Id. at 18). The officers would then "flush" the checkpoint by allowing a predetermined number of cars to pass without stopping at the check point. (Id. at 23). The officers would then return to stopping all cars. (Id.). The "flushing" of the area actually promoted safety and would lessen the time that an individual would have to wait in order to pass through the checkpoint. State v. Eggleston, supra109 Ohio App.3d at 225-226.
 {¶ 25} Accordingly the fourth prong of the Goines test has been met.
 {¶ 26} Appellant further argues that the State failed to prove that the government's interest outweighed the privacy rights of motorists and further no statistic evidence was presented to show the number of arrests for driving under the influence as a result of the checkpoint was presented to the trial court. Appellant suggests that this lack of evidence invalidates the checkpoint. We disagree.
 {¶ 27} The absence of statistical evidence is not fatal to the legality of a sobriety checkpoint: "[f]urthermore, we see no basis for holding that roadblocks are unconstitutional merely because only a small number of intoxicated drivers were apprehended as a result of the roadblock. Defendant argues that the State failed to meet its burden of showing that roadblocks conducted without any factual determination that an offense has been committed are necessary to detect drivers under the influence of alcohol or that roving patrols are not in fact more effective. Whatever the factual predicate for this argument, we hold that neither the Fourth Amendment to the United States Constitution nor the New Mexico Constitution requires the State to prove that there are no equally effective yet less intrusive alternatives for enforcing the DWI laws than roadblocks. SeeCommonwealth v. Shields, 402 Mass. 162, 521 N.E.2d 987, 989
(1988) (holding that state need not prove that no less intrusive alternative exists prior to implementing roadblock)." State v.Madalena (C.A., 1995), 121 N.M. 63, 70, 908 P.2d 756, 763). InState v. Downey, supra, the Tennessee Supreme Court noted: "courts upholding roadblocks generally refrain from analyzing whether roadblocks are more effective in advancing the state's interest in eradicating drunk driving than less intrusive means. Instead, these courts recognize that roadblocks are effective tools for use in detecting impaired drivers. Those views are expressed by Professor LaFave: `[I]t is certainly arguable that mere patrol and stopping based upon the Terry standard do not produce what the Camara Court referred to as `acceptable results.' For one thing, even if a patrolling officer is fortunate enough to be in the vicinity where a drunk driver is operating his vehicle, it does not necessarily follow that the driver will at that particular time drive his car in such a fashion as to create a reasonable suspicion justifying a stop. And the chances of such observation in the first place are rather slight, given the substantial number of intoxicated drivers on the road.' 4 W. LaFave, Search and Seizure: A Treatise on theFourth Amendment, (3rd ed. 1995), at 692. Moreover, courts have stressed that roadblocks further the state's interest not only bydetecting drunk drivers but also by deterring such behavior, particularly when the roadblock is accompanied by advance publicity." 945 S.W.2d at 109. (Footnotes omitted).
 {¶ 28} We fail to see how an after the fact assessment of the number of persons arrested can aid in the decision to establish the checkpoint in the first instance. If the pre-checkpoint publicity is successful people will be deterred from driving under the influence. Accordingly, the number of arrest will be lessened. Further, if roads are provided for people to escape the checkpoint this will decrease the number of violations. InStitz, only one person was arrested for driving under the influence. The trooper in the case at bar did testify that the area was chosen due to an increasing number of alcohol-related incidents. (T. at 7). There is no evidence in the record to suggest that the checkpoint was used as a subterfuge for a general check for criminal activity. Nor is there any persuasive evidence that the checkpoint was established or conducted in accordance with the sole and unbridled discretion of one or more officers. As the court in Sitz, supra, noted "[b]ut for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." 496 U.S. at 453-54; 110 S.Ct. at 2487.
 {¶ 29} The facts in evidence establish that the sobriety checkpoint in the case before us was no more subjectively intrusive than the checkpoint stop upheld in Sitz. As inSitz, the checkpoint in this case was selected and operated pursuant to guidelines adopted by a planning committee. Additionally, uniformed police stopped the approaching vehicles at a designated stopping point, and motorists were able to see that other vehicles were also being stopped. An average delay of one minute or less is not unreasonable.
 {¶ 30} In the case at bar, the appellant did not stop in compliance with the signage, or the direction of the officer on the scene. (T. at 21; 27-28). A patrol car was dispatched to stop appellant. (Id. at 21). Appellant does not argue that the officer did not have probable cause to arrest her after the stop was effectuated.
 {¶ 31} We conclude that the trial court did not err in finding that the sobriety checkpoint operated by the police on July 25, 2003, complied with the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution. Accordingly, we conclude that the trial court properly overruled appellant's motion to suppress.
 {¶ 32} Appellant's sole assignment of error is overruled.
 {¶ 33} For the forgoing reasons, the judgment of the Municipal Court of Ashland County, Ohio, is affirmed.
By Gwin, P.J., Hoffman, J., and Farmer, J., concur.
 {¶ 34} For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Municipal Court of Ashland County, Ohio, is affirmed. Costs to the appellant.