The STATE of Ohio, Appellee,

v.

Jason EGGLESTON, Appellant.

[Cite as *State v. Eggleston* (1996), 109 Ohio App.3d 217.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 14655.

Decided Feb. 9, 1996.

---

218

*John F. Blake,* Kettering City Prosecutor, for appellee.

*Don A. Little,* for appellant.

FAIN, Judge.

Defendant-appellant Jason R. Eggleston appeals from the denial of his motion to suppress evidence obtained against him as a result of a sobriety checkpoint operated by the Kettering Police Department on September 4 and 5, 1993. Eggleston argues that the evidence should be suppressed because the checkpoint was established and operated in violation of the Fourth and Fourteenth Amend-

ments to the United States Constitution and Section 14, Article I of the Ohio Constitution. He specifically asserts that the checkpoint was unconstitutional because (1) the police randomly stopped motorists; (2) the checkpoint amounted to three separate stops; (3) at the checkpoint, he was required to stop smoking, and the media was present covering the events; and (4) the checkpoint caused undue surprise to motorists because it did not provide a place for motorists to turn off and avoid passing through the checkpoint.

We find Eggleston's argument to be without merit. We conclude that the Kettering police operated the sobriety checkpoint in compliance with both the United States Constitution and the Ohio Constitution. Specifically, we conclude that the police did not randomly stop vehicles, but stopped them in accordance with objective and neutral criteria established by an objective planning committee. Based upon the undisputed facts of this case, we conclude that the fact that the sobriety checkpoint stop may have amounted to three different stops or phases is of no constitutional import. We conclude that the police request that Eggleston extinguish his smoking material and the media presence at the checkpoint are not factors that affect the constitutionality of the checkpoint. Finally, we conclude that the sobriety checkpoint was not unconstitutionally intrusive and did not cause undue surprise to motorists based on the failure to provide motorists an opportunity to avoid passing through the checkpoint. Accordingly, the judgment of the trial court is affirmed.

I

On September 5, 1993, at 1:25 a.m. defendant-appellant Jason R. Eggleston was charged with driving while under the influence of alcohol in violation of R.C. 4511.19(A)(1) and (A)(4). Eggleston was traveling west on Dorothy Lane Avenue when he was pulled over by Kettering police pursuant to a sobriety checkpoint that the police were operating between the hours of 10:30 p.m. and 3:30 a.m. on September 4 and 5, 1993. Eggleston entered a not guilty plea and moved the trial court to suppress all evidence obtained from the stop on the basis that the checkpoint was established and operated in violation of the Fourth and Fourteenth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution.

A suppression hearing was held in the Kettering Municipal Court on February 22, 1994. Due to a mechanical failure of the court reporter's recording devices, the testimony of only one witness was recorded. Therefore, the record of the hearing consists of the transcribed portions of Captain Michael Kemper's testimony, documentary evidence submitted by both parties, and a statement of evidence compiled by the trial court pursuant to an order of this court. The trial judge's statement of the evidence indicates that at the hearing the prosecution presented

testimony from Captain Kemper, Sergeant Michael Willcox, and Patrolman Steven Thacker, all of whom were members of Kettering Police Department. Eggleston presented no witness testimony, but offered his two citations as defense exhibits

The record of the hearing establishes the following pertinent facts:

In August 1993, Captain Kemper, in conjunction with a small committee, prepared guidelines for a sobriety checkpoint to be conducted by the Kettering Police Department on September 4 and 5, 1993. Kemper stated that the checkpoint was planned for the dual purpose of increasing the public perception of the seriousness of drunk driving violations and to arrest anyone caught breaking the law. The site of the checkpoint was selected based on traffic flow, safety, illumination, drunk driving arrests in the area, and the availability of public property to utilize in the operation of the checkpoint. The operation of the checkpoint was planned so that the average car traveling through it would be delayed less than forty-five seconds. Additionally, the sobriety check point was publicized via the television news and local newspapers in August 1993.

Prior to conducting the checkpoint, the Kettering police held a formal briefing session and distributed written guidelines to the participating officers. According to Kemper's testimony, the checkpoint was operated in accordance with the established guidelines, that is, the police stopped every third vehicle traveling east and west on Dorothy Lane between 10:30 p.m. and 11:00 p.m., every second car between 11:00 p.m. and midnight, and every car between midnight and 3:30 a.m.

The guidelines permitted deviation from the stopping pattern only as approved by the on-scene commander for safety reasons and required resumption of the designated pattern as soon as the reason for the deviation dissipated. Sergeant Willcox indicated that they deviated from the designated car-stop pattern twice for westbound traffic due to traffic congestion caused by movie theater traffic. During the periods when backed-up traffic necessitated a deviation from the car-stop plan, all cars were waved through the checkpoint. The deviations lasted only as long as the traffic was backed up.

For motorists traveling west on Dorothy Lane, the checkpoint was set up so that signs for the checkpoint were visible on the right side of the road approximately four hundred feet before the initial stopping point. The checkpoint required the designated cars to stop first at an initial contact point, which was approximately one hundred feet west of Oakmont Road, where a police officer would "greet" the drivers, explain that they were involved in a sobriety checkpoint, and engage them in "innocuous conversation" to make a cursory examination of the driver for no more than thirty seconds to identify any signs of impairment. After the initial contact, if insufficient signs of intoxication were

detected, the driver would be returned to traffic. However, if the checkpoint officer detected the smell of alcohol combined with other signs of intoxication, the driver would be requested to perform a rapid horizontal gaze nystagmus test ("HGN"). If more than one point of nystagmus was observed for each eye tested, the driver would be walked to the secondary checkpoint area for other forms of sobriety testing.

As a result of the September checkpoint, the Kettering police screened three hundred seventy-four out of six hundred ninety-nine cars traveling westbound on Dorothy Lane, tested twenty-two drivers, and arrested eleven. From the eastbound traffic, the police screened one hundred ninety-four out of four hundred ninety-two cars, tested eleven drivers, and arrested two. Overall, out of the total of five hundred sixty-eight motorists screened, the police arrested a total of thirteen drivers, which amounts to a 2.3 percent detection and arrest rate for all cars screened at the checkpoint.

Specifically regarding Eggleston's arrest, Patrolman Thacker testified that Eggleston met the criteria for further screening at the checkpoint greeting station based upon his flushed face, bloodshot eyes, and the strong odor of alcohol. After he scored six points on the HGN test, Eggleston was sent on for further final field sobriety testing. Sergeant Willcox, who assisted the arresting officer, testified that Eggleston performed poorly on all of the administered field sobriety tests and that on this basis, Eggleston was arrested.

The trial judge overruled Eggleston's motion to suppress. The trial judge concluded that the checkpoint was conducted pursuant to guidelines set by independent officers who did not participate in the checkpoint and that the guidelines met the requirements prescribed in *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412. The trial judge rejected Eggleston's contention that the Kettering police conducted the sobriety tests by making random stops of vehicles based upon the overbroad discretion of the field officers. Moreover, the trial court rejected Eggleston's contention that media presence at the scene violated his constitutionally protected liberties based on the fact that the checkpoint occurred in a public place where there was no expectation of privacy.

Following the trial court's ruling on the suppression motion, Eggleston changed his not guilty plea to a no contest plea, and the trial court found him guilty of both violations. Eggleston was sentenced to one hundred eighty days in jail with one hundred sixty days suspended and was fined $1,500 plus costs, with $1,000 of the fine suspended.

Eggleston appeals from the trial court's denial of his motion to suppress.

## II

Eggleston's sole assignment of error is as follows:

"The trial court erred in overruling the motion to suppress of defendant-appellant Jason R. Eggleston."

The United States Supreme Court has decided that a brief delay at a sobriety checkpoint lasting an average of twenty-five seconds and focusing solely on the issue of the driver's apparent sobriety does not offend the Fourth Amendment to the United States Constitution. *Sitz, supra,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412. In determining whether, in the absence of some level of individualized suspicion, a brief initial detention of a vehicle at a sobriety checkpoint is reasonable under the Fourth Amendment, the United States Supreme Court applied the balancing test adopted by it in *Brown v. Texas* (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357. This test requires the weighing of "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with the individual liberty." *Id.* at 50–51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362.

When establishing this balancing test in *Brown, supra,* the United States Supreme Court explained:

"A central concern in balancing these competing considerations * * * has been to assure that an individual's reasonable expectation of privacy is not subjected to arbitrary invasions solely at the unfettered discretion of officers in the field. * * * To this end, the Fourth Amendment requires that * * * the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* at 50–51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362.

In *Sitz,* the sobriety checkpoint was operated in the following way:

"Under the guidelines, checkpoints would be set up at selected sites along state roads. All vehicles passing through a checkpoint would be stopped and their drivers briefly examined for signs of intoxication. In cases where a checkpoint officer detected signs of intoxication, the motorist would be directed to a location out of the traffic flow where an officer would check the motorist's driver's license and car registration and, if warranted, conduct further sobriety tests. Should the field tests and the officer's observations suggest that the driver was intoxicated, an arrest would be made. All other drivers would be permitted to resume their journey immediately." *Id.,* 496 U.S. at 447, 110 S.Ct. at 2484, 110 L.Ed.2d at 418.

After applying the *Brown* balancing test to the particular facts of the case, the Supreme Court concluded that the balance of the "magnitude of the drunken driving problem [and] the States' interest in eradicating it," the reasonable success of the sobriety checkpoint program in advancing the public interest, and the minimal degree of intrusion upon individual motorists who were briefly

stopped at the initial checkpoint station weighed in favor of the state's sobriety checkpoint program, and it was therefore consistent with the Fourth Amendment.

When addressing the issue of whether the checkpoint in the case before us complies with the federal Constitution, we initially note, based upon *Sitz,* that prevention of drunk driving is a significant and recognized public concern served by a limited seizure of a motorist at a sobriety checkpoint that meets the first prong of the *Brown* balancing test. Furthermore, based on the 2.3 percent arrest ratio of the checkpoint operated by the Kettering police, which is significantly more successful than the 1.6 percent arrest rate approved in *Sitz,* we conclude that the checkpoint satisfied the second prong of the *Brown* test by serving as an effective means of furthering the public interest of eradicating drunk driving. Accordingly, if the sobriety checkpoint in the case before us does not exceed the constitutionally permissible level of intrusiveness on motorists, the checkpoint complies with the Fourth Amendment to the United States Constitution. See *Sitz, supra.* See, also, *State v. Bauer* (1994), 99 Ohio App.3d 505, 511, 651 N.E.2d 46, 49–50.

Eggleston argues that the sobriety checkpoint conducted by the Kettering police is factually distinguishable from the sobriety checkpoint under review in *Sitz* and that the checkpoint violated his constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution. Eggleston makes several specific arguments that the checkpoint unconstitutionally interfered with his individual liberties. First, he asserts that the sobriety checkpoint violated his federal and state constitutional rights because the Kettering police stopped automobiles on a random basis and failed to follow any consistent stopping pattern. Next, he asserts that the checkpoint stop was unduly intrusive of his federal and state constitutional rights because the sobriety checkpoint amounted to three separate stops, required him to extinguish all smoking material, and subjected him to media coverage. Finally, Eggleston contends that the sobriety checkpoint was unduly intrusive of his federal and state liberty interests because the sobriety checkpoint created substantial and undue surprise to motorists and did not allow motorists to avoid passing through the checkpoint.

We will first address Eggleston's contention that he was subjected to a random stop by the Kettering police. Eggleston argues that the Kettering police randomly stopped vehicles because they failed to stop every car that passed the checkpoint and failed to follow a consistent stopping pattern. Although we recognize that random stopping of vehicles based upon the "unbridled discretion" of the police officer in the absence of an individualized suspicion violates the Fourth Amendment to the United States Constitution, *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660, we do not agree that this case

involves a "random" stop or the exercise of the field officer's unconstrained discretion.

The facts in the record establish that the Kettering police followed checkpoint guidelines requiring them to increase the ratio of cars stopped from every third car to every car as time progressed and traffic became sparser. By following the car-stopping plan set forth in the guidelines for the checkpoint, the police did not exercise any discretion, unbridled or otherwise. We find no reason to conclude that a sobriety checkpoint that stops every third car between the hours of 10:30 p.m. and 11:00 p.m., every second car between the hours of 11:00 p.m. and 12:00 a.m., and every car between 12:00 a.m. and 3:30 a.m. is any more intrusive on individual liberties than the one-hundred-percent roadblock approved in Sitz. See Delaware v. Prouse, 440 U.S. at 664, 99 S.Ct. at 1401–1402, 59 L.Ed.2d at 673–675 (Blackmun, J., concurring). The undisputed facts in the record support the conclusion that the Kettering police stopped motorists according to objective criteria that had been established by an independent committee, which restricted the officer's discretion. Accordingly, we conclude that by following the guidelines established for determining which cars to stop, the Kettering police did not exercise unbridled discretion and did not randomly stop vehicles.

Furthermore, we do not agree with Eggleston's contention that the Kettering police officers' temporary deviation from the stopping plan during periods when traffic became excessively heavy necessitates the conclusion that the sobriety checkpoint amounted to random traffic stops.

The undisputed evidence indicates that the checkpoint guidelines permitted the on-scene commander to deviate from the approved stopping pattern for safety reasons as long as he reinstated the stopping pattern as soon as the reason for the deviation dissipated. The facts as set forth in the trial court's statement of evidence establish that:

"Sergeant Willcox indicated that they deviated from the plan twice for west-bound traffic. The first time was shortly after 11:00 p.m. when the Kettering movie theater had a large exodus of vehicle due to the movie ending. At that time for approximately three to five minutes, all cars were waived through until the backlog was cleaned up. The second deviation also occurred as a result of the Kettering movie theater letting out and again there was a suspension with all cars waived through for less than five minutes when the checkpoint again returned to the pattern required for stops."

The fact that the checkpoint guidelines permitted the on-scene commander to deviate from the approved stopping pattern to alleviate safety concerns does not lead us to conclude that the plan approved of the exercise of an officer's unbridled discretion amounting to random stops. By interrupting the planned stopping pattern and permitting all cars to proceed through the checkpoint, the police

eliminated all intrusion on motorists for a short period of time, for the good reason that the sudden increase in traffic resulting from the departure of an audience from a nearby movie theater created more traffic than the sobriety checkpoint could handle without backing up traffic significantly, with the result that motorists would have to endure more than a forty-five-second delay. As a matter of fact, provision for deviation in the pattern to meet sudden increases in traffic accommodated Fourth Amendment concerns by preventing the sobriety checkpoint from becoming unreasonably intrusive in its impact on motorists. In the absence of evidence to support the conclusion that the police failed to return to the objective requirements for determining which cars to stop, we cannot say that deviation from the plan amounted to random stopping.

Next, Eggleston asserts that the stop at the checkpoint was unduly and unconstitutionally intrusive because it amounted to three separate stops. Eggleston argues that the Kettering police stopped him three times: "First, he was stopped and told to put out his cigarette and told that another officer would be talking to him regarding impaired drivers. Second, he was stopped by an officer looking for impaired drivers. Third, he was stopped at yet another point where sobriety field tests were given." He contends that his stop at the sobriety checkpoint was factually distinguishable from the stop approved of in *Sitz*, where the driver was only stopped two times, and was unconstitutionally more intrusive. We do not agree.

In *Sitz*, the United States Supreme Court, in evaluating the lawfulness of the sobriety checkpoint, addressed "only the initial stop of each motorist passing through the checkpoint and the associated preliminary questioning and observation by checkpoint officers." *Id.*, 496 U.S. at 450–451, 110 S.Ct. at 2485, 110 L.Ed.2d at 420. As we explained in *State v. Blackburn* (Mar. 23, 1994), Clark App. No. 3084, unreported, 1994 WL 95224:

"With respect to sobriety checkpoints, it would appear that there are three phases of detention, each requiring somewhat different analysis under the search and seizure provisions of the United States and Ohio constitutions. The first is the initial detention at the checkpoint itself. The second is a continuing investigative stop, resulting in a somewhat longer delay, that may result if the driver, as a result of the initial detention, is reasonably suspected of being under the influence of alcohol. Finally, the third phase is an actual arrest for being under the influence, which would require probable cause."

The fact that the sobriety checkpoint in the case before us may have involved several different phases of detention and investigation does not lead us to necessarily conclude that the sobriety checkpoint was unconstitutional. When evaluating the lawfulness of the checkpoint, we are most concerned with the

guidelines, duration, and intrusiveness of the initial stop. *Sitz, supra.* Beyond the initial stop, "[d]etention of particular motorist for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard." *Sitz,* 496 U.S. at 451, 110 S.Ct. at 2485, 110 L.Ed.2d at 420, citing *United States v. Martinez–Fuerte* (1976), 428 U.S. 543, 567, 96 S.Ct. 3074, 3087, 49 L.Ed.2d 1116, 1133–1134. However, the individualized suspicion needed to justify a longer investigatory detention is usually acquired from information gathered as a result of the initial stop.

Like *Sitz,* the sobriety checkpoint at issue in the case before us involved a brief initial detention of motorists for the detection of obvious signs of intoxication. In the present case, the average delay for any car passing through the checkpoint was forty-five seconds. During the initial stop, the police only engaged the motorist in conversation to observe the motorist's ability to talk and to detect any obvious sign of intoxication. As in *Sitz,* where the checkpoint delay averaged twenty-five seconds and involved cursory conversation between the police and the motorist, the initial stop in the case before us was brief and unintrusive. We do not find the twenty-second difference in delay between the stop in the case before us and the stop in *Sitz* to be constitutionally fatal.

Furthermore, the undisputed evidence supports the conclusion that the initial detention was extended into a further investigative stop involving an HGN test only if the officer detected sufficient signs of intoxication to justify a reasonable suspicion that the driver was under the influence of alcohol. Moreover, the detention was extended for field sobriety testing only if the driver scored a critical score on the HGN test. Accordingly, motorists were kept longer than the brief initial detention period only if indicia of intoxication were immediately apparent to justify further investigation.

We conclude that the fact that Eggleston's stop may have involved three phases, as opposed to two phases in *Sitz,* is not dispositive. The undisputed evidence establishes that the police progressed from one phase of the sobriety checkpoint investigation to the next only after they had information to support an individualized suspicion that Eggleston was violating the law. The type of stop utilized by the police in the case before us, which began as a brief initial stop and developed into a more intrusive stop only based upon particular, individualized suspicion acquired from information gathered through the initial stop, is not only consistent with the Fourth Amendment's restriction against unreasonable searches and seizures, it is exactly the kind of stop that should be encouraged, in which a principled balance has been struck between the need to discourage drunk driving and the right of the travelling public to be secure from unreasonable police interference. Therefore, we reject Eggleston's contention that the sobriety checkpoint stop was unconstitutional because it involved three separate stops.

■ Eggleston also argues that the sobriety checkpoint stop was unduly intrusive of his individual liberties because the initial "greeting" officer directed him to extinguish his cigarette. We do not entirely discount the fact that the police officer's request for Eggleston to extinguish his cigarette may involve some amount of intrusion upon his individual liberties; however, we are not persuaded that it rises to the level of an unconstitutional intrusion in this situation. Unlike the routine request for a driver's license and vehicle registration required during the initial sobriety checkpoint stop examined in *State v. Blackburn, supra*, the request for Eggleston to extinguish his cigarette was directly related to the police officer's attempt to detect intoxication by preventing the odor of alcohol from being masked by the cigarette "smoke-screen." Because the request was related to the detection and prevention of drunk driving and only lasted for a brief period of time, we cannot say that the temporary nonsmoking directive rendered the otherwise unintrusive and limited initial stop unconstitutional.

■ Furthermore, Eggleston argues that the news media presence at the checkpoint was unduly intrusive on his personal liberties. Eggleston does not argue that the media's presence posed any particular threat to his personal liberties, but complains about their very presence at the checkpoint. In support of this assertion, Eggleston argues that "there was substantial media coverage of the sobriety check point. There were at least two television stations present and there were photographers present. * * * They were taking pictures of the cars being stopped and were doing interviews." However, the factual record is devoid of evidence establishing any negative effect the media presence may have had on the operation of the sobriety checkpoint or how the presence of the media gave rise to a constitutional violation.

In light of the state's notable interest in raising public awareness of drunk driving as a means of ameliorating its lethal effects, the public nature of arrests and crime prevention, and the absence of any facts establishing that the media presence created a spectacle or circus atmosphere, we cannot conclude that the media's recording of lawful acts of the police rendered those acts unconstitutional. Based on the facts established in the record, we cannot conclude that the media presence at the sobriety checkpoint converted an otherwise lawful sobriety checkpoint into a stop that intruded unreasonably upon Eggleston's constitutionally protected liberty interests.

■ Finally, Eggleston argues that the checkpoint created undue surprise to motorists and was unduly and unconstitutionally intrusive on personal liberties because there was no opportunity for a motorist to avoid passing through the checkpoint. However, we find no merit in this argument.

In *Sitz*, when considering the level of intrusion imposed on an individual by a sobriety checkpoint stop, the United States Supreme Court considered both objective and subjective intrusion. Objective intrusion involved consideration of the duration of the seizure and the intensity of the investigation. Subjective intrusion involved the checkpoint's potential for generating "fear and surprise." *Id.*, 496 U.S. at 452, 110 S.Ct. at 2486, 110 L.Ed.2d at 421.

In *Sitz*, the Michigan appellate court had concluded that the checkpoint stop caused unreasonable subjective intrusion because "the record failed to demonstrate that the approaching motorists would be aware of their option to make U-turns or turnoffs to avoid the checkpoint." *Id.* at 452, 110 S.Ct. at 2486, 110 L.Ed.2d at 421. However, the United States Supreme Court concluded that "the Michigan courts misread our cases concerning the degree of 'subjective intrusion' and the potential for generating fear and surprise." *Id.* at 452, 110 S.Ct. at 2486, 110 L.Ed.2d at 421. The court explained that "[t]he 'fear and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.* at 452, 110 S.Ct. at 2486, 110 L.Ed.2d at 421. Therefore, the *Sitz* court held that, unlike roving patrol stops, stationary checkpoints that are visible to motorists from a distance and that are operated according to set guidelines by uniformed officers do not generate an undue amount of fear or annoyance to a motorist and, therefore, do not create an unconstitutional degree of subjective intrusion on a motorist's personal liberties. *Id.*, citing *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083, 49 L.Ed.2d at 1128–1129.

The undisputed facts in evidence establish that the sobriety checkpoint in the case before us was no more subjectively intrusive than the checkpoint stop upheld in *Sitz*. As in *Sitz*, the checkpoint in this case was selected and operated pursuant to guidelines adopted by a planning committee. Additionally, uniformed police stopped the approaching vehicles at a designated stopping point, and motorists were able to see that other vehicles were also being stopped. The fact that there was nowhere for motorist to turn off to avoid the sobriety checkpoint does not affect our analysis of the level of fear and surprise engendered in a law-abiding motorist by the nature of the stop. Accordingly, we reject Eggleston's contention that the sobriety checkpoint caused an unreasonable subjective intrusion upon motorists' protected liberty interests.

Finally, we reject Eggleston's argument that all sobriety checkpoints, in general, and this sobriety checkpoint in particular, violate Section 14, Article I of the Ohio Constitution. Although we recognize that states are free to construe their own constitutions more expansively with respect to civil liberties than the federal Constitution as interpreted by federal courts, we also recognize that the

Ohio Supreme Court has noted the "virtually identical" wording of the applicable Ohio and federal provisions protecting the citizen from unreasonable government searches and seizures.[1] *State v. Geraldo* (1981), 68 Ohio St.2d 120, 22 O.O.3d 366, 429 N.E.2d 141. Therefore, in the absence of any guidance from the Ohio Supreme Court, we find no reason to interpret Ohio's constitutional search and seizure provisions differently from federal constitutional provisions.

We conclude that the trial court did not err in finding that the sobriety checkpoint operated by the Kettering police on September 4–5, 1993, complied with the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution. Accordingly, we conclude that the trial court properly overruled Eggleston's motion to suppress.

Eggleston's sole assignment of error is overruled.

### III

Eggleston's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

GRADY and FREDERICK N. YOUNG, JJ., concur.

---

1. The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

Section 14, Article I of the Ohio Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized."