I concur that Kevin L. Smith does not have standing to object to the constitutionality of the Dayton Police Department's license checkpoint program.
I must respectfully dissent from the majority's view that the program was in accordance with the Fourth Amendment of the United States Constitution and Section 14, Article I of the Ohio Constitution. In my view, the paucity of the State's evidence purporting to show that unlicensed drivers present a grave danger on the road as well as the effectiveness of the checkpoints in facilitating the apprehension of unlicensed drivers requires a conclusion different than that expressed by the majority.
The majority supports its decision with numerous cases involving checkpoints, including the Ohio case of City of CuyahogaFalls v. Church (1967), 10 Ohio App.2d 9, 10, from which the majority quotes the following passage:
 As an indication of the extent to which a motorist must submit to the lawful demands of an officer to determine such motorist's right to exercise his license to operate a motor vehicle on the public highway, we cite the case of Schmerber v. State of California, 384 U.S. 757 [parallel cites omitted], decided June 20, 1966, by the Supreme Court of the United States, wherein that court found that a defendant's constitutional rights had not been violated by a compulsory blood test, and the admission of the evidence thereof at trial for driving a motor vehicle while intoxicated.
 Presumably, the majority is of the opinion that this excerpt stands for the proposition that government may go to great lengths in its mission to enforce the driver's license laws of the state, even where, as here, no probable cause or reasonable suspicion is present. The police officer who arrested the defendant in the Schmerber case cited by the Church court, however, was found to have had probable cause to arrest the suspect without a warrant, unlike the present case. Furthermore, the post-arrest blood sample discussed in Schmerber
was lawfully taken pursuant to a well-recognized exception to the warrant requirement, namely, that the evidence, the defendant's blood alcohol level, would have dissipated before a search warrant could have been obtained and executed. Consequently, the Church court's comparison, and by implication, the majority's comparison in this case, of the search and seizure in Schmerber to that of a suspicionless checkpoint stop is peculiar.
The majority also cites twenty-four cases from other states in which license and registration checkpoints were found not to be in violation of the Fourth Amendment of the United States Constitution. All told, however, nine of those cases involved checkpoints established to detect violations other than those relating to driver's licenses and registration, including five relating to checkpoints designed to intercept, inter alia, drunk drivers, which, pursuant to Sitz, have been found to be constitutional. See People v. Andrews (Colo. 1971), 484 P.2d 1207
(considering checkpoint that included a safety inspection of the vehicle); Duncan v. United States (App.D.C. 1993), 629 A.2d 1
(involving checkpoint set up to intercept drunk drivers and drug traffickers); Rennard v. State (Fla.App. 1996), 675 So.2d 1006
(evaluating constitutionality of checkpoint established to intercept drunk drivers, perform safety equipment checks, and to question motorists about a fugitive); LaFontaine v. State
(Ga. 1998), 497 S.E.2d 367 (considering license/registration checkpoint in which additional purpose was to discover "other violations"); People v. Bartley (Ill. 1985), 486 N.E.2d 880
(finding sobriety checkpoint constitutional); Kinslow v.Commonwealth (Ky.App. 1983), 660 S.W.2d 677 (holding sobriety checkpoint constitutional); State v. Grooms (N.C.App. 1997),483 S.E.2d 445 (evaluating constitutionality of checkpoint established for purpose of checking for outstanding warrants and stolen vehicles); State v. Wetzel (N.D. 1990), 456 N.W.2d 115 (considering checkpoint that included a safety inspection of the vehicle); andLowe v. Commonwealth (Va. 1985), 337 S.E.2d 273 (upholding constitutionality of sobriety checkpoint). In addition, two of the cases cited by the majority never even reached the question of the checkpoint's constitutionality. See Howard v. Voshell
(Del.Super. 1992), 621 A.2d 804; State v. Valencia-Olaya (N.M.App. 1987), 736 P.2d 495. Moreover, one of the federal cases cited by the majority as supporting the constitutionality of license and registration checkpoints actually involved a roadblock "established to respond to identified problems of traffic congestion," as illogical as that may be, and was instituted in response to citizens' complaints about drug trafficking in the area where the checkpoint was located. United States v. McFayden
(C.A.D.C. 1989), 865 F.2d 1306. Thus, while it may remain true that the "weight of authority" is in favor of the constitutionality of license/registration checkpoints, it is so to a somewhat lesser degree than the majority opinion suggests.
In the present case, after hearing all the evidence presented at the suppression hearing, the trial court observed that "[t]here was no evidence which indicated that unlicensed drivers posed more of a danger to others on the road than licensed drivers." The majority dismisses the trial court's finding on the basis of the Supreme Court's observation in Delaware v. Prouse (1979),440 U.S. 648, 658, that the states have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles and that the vehicles are fit for operation. That the State has such a vital interest is beyond question. Without meaningful discussion as to the seriousness or gravity of the unlicensed driver problem in Dayton, however, it is impossible to balance the state's interest against the intrusion into motorists'Fourth Amendment rights.
I agree with the trial court's result, although I believe the real question is not whether unlicensed drivers are more dangerous on the road than licensed drivers, but rather whether unlicensed drivers present a threat roughly equivalent to or greater than that posed by drunk drivers or excessive illegal immigration, both of which have been found to be of sufficient weight to justify intrusions on motorists' Fourth Amendment interests. See MichiganDept. of State Police v. Sitz (1990), 496 U.S. 444; United Statesv. Martinez-Fuerte (1976), 428 U.S. 543; State v. Eggleston
(1996), 109 Ohio App.3d 217. In other words, even assuming, as the majority does, that unlicensed drivers are less safe on the road than licensed drivers does not automatically result in a conclusion that the government's interest in removing the unlicensed driver from the road is equal in gravity to its interests in removing drunk drivers from the roadways or in assuring the integrity of our nation's border.
In Martinez-Fuerte, the Court cited statistics indicating that although legal immigration was limited by national policy to 120,000 people a year, 10 to 12 million illegal immigrants enter the United States each year, eighty-five percent of whom are from Mexico. Id. at 551. The Court also recognized the formidable law enforcement problem caused by such immigration. Id. at 552.
In contemplating the problems caused by intoxicated drivers, the Supreme Court stated in Sitz:
 No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion. The anecdotal is confirmed by the statistical. "Drunk drivers cause an annual death toll of over 25,000 and in the same time span caused nearly one million personal injuries and more than five billion dollars in property damage." 4 W. LaFave, Search and Seizure: A treatise on the Fourth Amendment § 10.8(d), p. 71 (2d ed. 1987). For decades, this Court has "repeatedly lamented the tragedy." (Citations and footnotes omitted.)
 Sitz, supra at 451. Because the hazards of drunk driving are so much a part of our national consciousness, some courts have taken judicial notice of the government's overwhelming interest in deterring and apprehending those who drive while intoxicated. See, e.g., State v. McLaughlin (Ind.App. 1984), 471 N.E.2d 1125, 1136. Research reveals no similar treatment of the problems associated with unlicensed drivers. At least one court has recognized that the "State has a much graver concern in detecting and deterring driving while intoxicated and under-age drinking" than it does in checking automobiles and drivers for proper registration and certification. State v. Garcia
(Ind. 1986), 500 N.E.2d 158, 161. But cf. Commonwealth v. Blouse (Pa. 1992), 611 A.2d 1177, 1179 (reasoning that rationale for sobriety checkpoints applies equally to driver's license/registration checkpoints due to the "mass carnage" caused by unsafe automobiles and unlicensed drivers, but citing no statistics in support). I am aware of no court that has found the harm caused by unlicensed drivers alone to be comparable to that caused by drunken drivers or by the flood of illegal immigration occurring at our border with Mexico. Since the danger associated with unlicensed drivers is not a fact of which the trial court could have taken judicial notice, it was incumbent upon the State to show by a preponderance of the evidence that the dangers of driving without a license are so great that intrusions on motorists' Fourth Amendment rights are warranted to curtail the problem. I agree with the trial court that the State failed to carry its burden in that respect.
At the suppression hearing, Lieutenant Bardun testified as to the rationale behind and development of the checkpoint program. The testimony relevant to the problem sought to be if not remedied, then at least impacted by the checkpoints, is as follows:
 So, would — Your checkpoints were for the sole purpose of driver's licenses, no other purpose?
A. That was the primary function of it.
* * *
 And as to this particular — umm — type of checkpoint — umm — what — was there any rationale given as to why people who may or may not be driving without a driver's license were to be targeted?
 A. The explanation was given to me was that this is a police tactic or practice that is being used successfully in other jurisdictions around the country — umm — New York City, Georgia, Florida, Texas and that we wanted to start using that as a practice.
* * *
 Was there any — umm — or are you aware in your 24 years as a police officer with the City of Dayton Police Department aware of any particular correlation between whether a person is valid with the Bureau of Motor Vehicles and their ability to actually operate a motor vehicle?
 A. Not sure of any studies other than those persons who are licensed and are suspended that is based on some sort of driving other than the recent drug suspensions.
* * *
 But you're unaware of any correlations between a person safely operating a motor vehicle and whether they're valid with the Bureau of Motor Vehicles?
A. That's right.
* * *
 * * * Was there any — In the planning and selection of how many [checkpoints] to have in each district, was there any statistical analysis done of — umm — of — um — of the frequency of people driving without a driver's license, where they physically lived in this city?
A. No, sir, there was not.
Tr. at 11, 14-15, 16-17. Furthermore, the checkpoint guidelines themselves, which were admitted into evidence, contained the following introductory comments:
 The purpose of a driver[`]s license checkpoint is to deter the operation of motor vehicles by unlicensed drivers or drivers whose licenses are under suspension. Of the almost 3.2 million drivers in the state of Ohio, approximately 800,000 have their driver[`]s license under some sort of suspension. Approximately 30% of the traffic citations issued by the Dayton Police Department are for driver[`]s license violations. It has been estimated that approximately 1 in 8 drivers on the streets of Dayton either do not have a driver[`]s license or their license is suspended.
Nothing in the record indicates the trial court's conclusion that the primary purpose of the checkpoint program was the apprehension of unlicensed drivers rather than the promotion of roadway safety was arrived at erroneously.[5] Lieutenant Bardun, who was instrumental in developing the program, acknowledged that the primary purpose of the checkpoints was to check driver's licenses, but stated he did not conduct any study to discover whether there is a correlation between motorists' driver's license status and unsafe operation of a motor vehicle, nor was he aware of any such study that may have been conducted by anyone else. The record contains no evidence indicating unlicensed drivers are disproportionately involved in traffic accidents, fatal or otherwise.[6] Moreover, although the introductory comments to the guidelines contain certain statements relating to unlicensed drivers in Ohio, they do not suggest such drivers are inherently unsafe on the road, nor do they establish that the checkpoints were contemplated as a method of improving roadway safety. On the contrary, the comments focus exclusively on the number of unlicensed drivers estimated to be present in the state with no reference whatsoever as to any danger they might pose to themselves, their passengers, or others on the roadways. The State claims the trial court erroneously presumed unlicensed drivers to be as safe, if not safer, than licensed drivers. This simply misstates the trial court's reasoning. What the court did was decline to presume, in the absence of any evidence to support the presumption, that unlicensed drivers are intrinsically unsafe behind the wheel of a motor vehicle. On the record before this court, I cannot agree with the majority that the court's reluctance in this regard was an abuse of discretion.
It is important to note, too, that not all license suspensions and revocations are a consequence of the licensee's poor driving ability. For instance, R.C. § 4507.16(A) provides that a trial court may suspend or revoke a driver's license when a person is convicted of, inter alia, making a false affidavit or perjury under certain circumstances, a felony in the commission of which a motor vehicle was used, failure to stop and disclose identity when required by law, willfully eluding or fleeing a police officer, or trafficking in cigarettes to avoid payment of the cigarette tax. Thus, the majority erroneously assumes, in the absence of any supporting empirical evidence, that all or even most unlicensed drivers are so because of unsafe driving habits.
Furthermore, the estimate that thirty percent of the traffic citations issued by the State are for driver's license violations is meaningless without more since it is possible, perhaps even probable, that a significant portion of those citations were issued to licensed drivers who refused to display their license or who happened to be stopped without their license in their possession and were subsequently cited for failure to display their license in violation of R.C. § 4507.35, neither of which necessarily implicates any dangerous driving practice on the part of the motorist. Nor does the bare estimate of what percentage of citations issued by Dayton police are for driver's license violations tell whether those eventually cited for such violations were initially stopped for unsafely operating their vehicles or some innocuous reason. For these reasons, I am unable to draw the conclusion from the police department's estimate that the State urges. Consequently, I would find no error by the trial court in its determination that the State failed to demonstrate by a preponderance of the evidence that unlicensed drivers present such a danger on the roadways that intrusions on motorists'Fourth Amendment interests are justified.
The State also contends, however, that the trial court erred in presuming that roadway safety was the only possible governmental interest to be served by the checkpoints. It claims that its interest in maintaining the integrity of the driver's licensing scheme and court orders suspending driver's licenses combines with its interest in roadway safety to justify the intrusion inherent in the checkpoints.
In State v. Blackburn (Mar. 23, 1994), Clark App. No. 3084, unreported, this court expressed its disdain for the State's practice of requiring its citizens to furnish their identification at a sobriety checkpoint as follows:
 In essence, the sobriety checkpoint required all travelers on a particular highway at a particular time to furnish identification, as well as a vehicle registration. From time to time, in other countries, travelers have been required to produce their papers for inspection by the police. This has been a popular tool of totalitarian regimes to maintain control over the citizenry. It has yet to flourish on the soil of this country, and we are reluctant to provide it an opportunity to take root, no matter how laudable the purpose for which it is presently espoused.
Id. In the very next sentence, we found the sobriety checkpoint at issue to be unconstitutional under the Fourth Amendment to the United States Constitution. Less than a month later, we upheld a sobriety checkpoint program that did not include the requirement that motorists produce their driver's licenses for inspection.State v. Kelley (Apr. 13, 1994), Greene App. No. 93-CA-57, unreported. What was unacceptable under the guise of a sobriety checkpoint, is also unacceptable in isolation. I am cognizant that the majority may consider my position to be incongruous with the United States Supreme Court's statement in Prouse suggesting that roadblocks could be one viable alternative to roving patrols for driver's license checks. That statement, however, was merely the Court's supposition in dictum that such methods might be constitutionally acceptable, and does not negate the requirement that the checkpoint scheme be a sufficiently productive means of advancing the State's interest in order to justify the intrusion upon motorists' Fourth Amendment interests. See Prouse, supra at 659. This point is made obvious by the Court's statements distinguishing Sitz from Prouse on the basis of, inter alia,Prouse's complete lack of empirical evidence indicating the roving stops would be an effective means of promoting roadway safety, and its reliance on the effectiveness of the Sitz
checkpoint in finding it constitutional. Sitz, supra at 454. Here, the State fails to meet its burden with regard to the effectiveness of the driver's license checkpoints, a point that I address more fully below.
With no evidence to support its contention that unlicensed drivers pose a special safety hazard on the road, the State's regulatory interest in enforcing the driver's license law, or as the trial court put it, its interest in apprehending unlicensed drivers, was the only interest to be weighed in applying the Brown
test to the facts of this case. The State's interest in enforcing the driver's license law, however, is no greater, and is perhaps less so, than its interest in enforcing any law. Surely, the State's interest in enforcing the laws against shoplifting, petty theft, and kidnaping, for instance, is at least as great as it is in enforcing the driver's license law. Yet there can be no doubt that checkpoints for the purpose of detecting such crimes would not pass constitutional muster. See Blackburn, supra, citingState v. Henderson (Idaho 1988), 756 P.2d 1057, 1063; and Statev. Smith (Okla.Crim.App. 1984), 674 P.2d 562, 564-65. Thus, the State's interest here, though legitimate, is not, in and of itself, of such gravity that it justifies the checkpoint intrusions on motorists' Fourth Amendment right to be free from unreasonable seizures. I would overrule the State's first and second assignments of error as to Magus Orr and Andre Smith.
The majority is persuaded by the State's contention that the checkpoint program was so effective in advancing its interest in enforcing the driver's license law that it outweighs motorists'Fourth Amendment interests. I cannot agree.
The trial court analyzed the effectiveness of the checkpoints as follows:
 There was no evidence that the roadblock was a necessary tool for law enforcement. Approximately ten to thirteen officers were taken out of service elsewhere to conduct the checkpoints from 6:30 p.m. to 1:30 a.m. Given the finite number of police officers and police resources, there was no evidence that the officers were more efficient than they would have been had they been on routine patrol investigating and arresting those committing traffic offenses or other offenses such as domestic violence, theft, burglary, robbery, prostitution and other crimes that plague the streets of Dayton and present obvious dangers to the community.
The State correctly argues that evaluation of the effectiveness of a checkpoint program does not include consideration of the necessity of the tactic to law enforcement, and that it is not for the courts to determine whether staffing the checkpoints was a wise use of police resources. As the majority points out, in Sitz, supra, the United States Supreme Court explained the appropriate effectiveness analysis as follows:
 The actual language from Brown v. Texas, * * * describes the balancing factor as "the degree to which the seizure advances the public interest." 443 U.S., at 51, 99 S.Ct., at 2640. This passage from Brown was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.
Id. at 453. Thus, I agree with the majority that the trial court improperly determined that the police officers on duty at the checkpoints could have been more efficiently used on patrol fighting the wide assortment of crimes that are perpetrated in Dayton. In my view, however, that finding does not negate the necessity of inquiring into whether the checkpoints were effective in accomplishing the purpose for which they were instituted.
While any analysis of a checkpoint's effectiveness should factor in its deterrent effect, no evidence was submitted to the trial court to suggest the checkpoints in this case had any deterrent effect whatsoever on unlicensed drivers taking to the roads. Moreover, since the checkpoints here were not publicized prior to their implementation, their deterrent effect, if any, would have been negligible.
As in sobriety checkpoint cases, however, effectiveness can be determined by calculating what percentage of the motorists passing through the checkpoints was cited or arrested for driver's license violations. In Sitz, supra, the checkpoint resulted in approximately 1.6 percent of the drivers passing through the roadblock being arrested for driving under the influence of alcohol. Id. at 455. In Ohio, sobriety checkpoints with arrest rates of 2.3 percent, 2.1 percent, and .258 percent have been upheld as constitutional. Bauer, supra at 510; Eggleston, supra at 224; State v. Brown, supra. For the reasons that follow, however, these effectiveness rates cannot be compared with that of the checkpoints in the present case, and their relative effectiveness is consequently incalculable.
In its argument on the effectiveness of the checkpoints, the State claims that due to the difficulty of detecting unlicensed drivers, which it attributes to the lack of any "observable characteristics" that would presumably draw a patrolling officer's attention, the checkpoints are an important and effective method of advancing the government's interest in enforcing the requirement that motorists be properly licensed. This argument is contradicted, however, by the State's own statistic showing that prior to implementation of the checkpoint program, fully thirty percent of all traffic citations issued in the City of Dayton were for driver's license violations. Aside from the obvious contradiction in the State's arguments, it is clear that effective and productive means of detecting and citing unlicensed drivers, short of intrusions into motorists' Fourth Amendment interests, are in existence and have been successfully employed by the Dayton Police Department in the past.
Furthermore, even if every arrest and citation resulting from the checkpoints were for driving without a license, which is by no means established by the record, and assuming no violator received more than one citation, which is certainly not the case, only slightly more than eighteen percent of motorists stopped at the checkpoints would have been in violation of the driver's license law. Comparing the Dayton Police Department's two methods of detecting unlicensed drivers, therefore, it can be concluded that routine patrol, which it is recalled has a license violation citation rate of 30%, is nearly twice as effective as the checkpoints.
In addition, and without considering the citations issued, the State argues that the arrest rate of the checkpoint, which it calculates to be at 7.5 percent, is proof of its effectiveness. It must be noted, however, that Lieutenant Bardun testified he was not sure how many of the arrests were for driver's license violations, making it impossible to gauge the effectiveness of the checkpoint program with any semblance of accuracy. At the suppression hearing, no evidence was produced showing any of the citations or arrests, other than those of the Appellees, were driver's license related. Although I suspect some were, suspicions should never form the basis of a judicial decision, regardless of their strength. Therefore, I would conclude that the State has failed to demonstrate by a preponderance of the evidence that the checkpoints were an effective method of advancing its interest in enforcing the driver's license law. Although the trial court reached the same result via a different route, I cannot say its conclusion was error. Consequently, I would overrule the State's third assignment of error as to Magus Orr and Andre Smith, and affirm the judgment of the trial court.
[5] In fact, after careful review of the entire record in this case, I cannot say the trial court would have erred had it held that the checkpoints were a pretext for a general "fishing expedition." For example, Lieutenant Bardun testified that the "target enforcement areas" were selected, at least in part, on the basis of the crime rate in the area and the district commanders' identification of their undefined "problem areas." Tr. at 18. Furthermore, he testified that the secondary function of the checkpoints was to have a "positive affects on crime and — umm — order maintenance." Tr. at 19. Lieutenant Bardun also testified that there were occasions when motorists who legally avoided the checkpoint by turning off the road on which it was being conducted were pursued and their license plate run through the computer to "see if there was some other reason to stop them." Tr. at 13. The implication that can be drawn from these statements is chilling.
[6] The State attached to its appellate brief an article which was published in 1996 and purports to estimate the exposure and fatal crash rates of unlicensed drivers in California. This article, though available at the time, was not introduced into evidence in the trial court and therefore forms no part of the record. App.R. 9(A). Consequently, it cannot be considered on appeal. App.R. 12(A)(1)(b).