[Cite as *State v. Rice*, 2013-Ohio-5056.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2013-CA-5 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case Nos. 2011-CR-216B |
| v. | : | |
| | : | |
| DAVID E. RICE, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | : |

. . . . . . . . . .

O P I N I O N

Rendered on the 15th day of November, 2013.

. . . . . . . . . .

ANTHONY E. KENDELL, Atty. Reg. #0067242, Miami County Prosecuting Attorney's Office, 201 West Main Street – Safety Building, Troy, Ohio 45373
        Attorney for Plaintiff-Appellee

JENNIFER S. GETTY, Atty. Reg. #0074317, 46 East Franklin Street, Centerville, Ohio 45459
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, P.J.

{¶ 1}    Defendant-appellant David E. Rice, Jr., appeals from his conviction and sentence, following a no-contest plea, for Possession of Oxycontin, in an amount equaling or

exceeding five times the bulk amount, but less than fifty times the bulk amount, in violation of R.C. 2925.11(A), (C)(1)(c), a felony of the second degree.

{¶ 2}     Rice contends that the trial court erred by overruling his motion to suppress evidence that he alleged to have been obtained as the result of an unlawful search and seizure. We conclude that the state trooper who conducted the search and seizure had a reasonable, articulable suspicion of criminal activity justifying a brief investigative stop.    Information obtained from Rice and his passenger resulted in an enhanced suspicion of criminal activity, which justified an additional delay of about 20-25 minutes until a drug sniffing dog could be brought to the scene.    The dog immediately alerted on Rice's car, which justified the search, resulting in the seizure of what was determined to be oxycontin, an unlawful drug. Consequently, we conclude that the trial court did not err in overruling the motion to suppress, and the judgment of the trial court is Affirmed.

## I.    The Stop, Search, and Seizure

{¶ 3}     One night in mid-July 2011, at about midnight, State Trooper Steven L. Shafer, Jr., was checking registrations of cars parked at a southbound rest stop on Interstate Route 75, in Miami County, Ohio.    He noticed a car, later determined to belong to Rice, parked backwards, toward the south end of the parking area.    No license plate was showing on the front of the car, so Shafer could not check the registration.    It appears from the record that the car had a temporary tag, and that Rice had come from his home in Kentucky, so that the car may have had a temporary tag issued in Kentucky.

{¶ 4}     Shafer parked near Rice's car, intending to get out of his cruiser and look at the

car's rear license plate, so that he could run the registration. Just as Rice started to open his cruiser door, Rice's car pulled out of the parking spot, proceeded north in the parking area, and parked, apparently with the front end closest to the curb. Shafer pulled out and followed. As Shafer neared the car, the car backed out of the parking space, and proceeded south, onto the entrance lane to I-75. Somewhere along the way, Shafer was able to run the temporary tag number through his dispatcher, but no registration was returned. Shafer turned on his overhead lights and stopped Rice's car.

{¶ 5} Shafer testified that Rice and his passenger were "overly nervous":

Q. All right. I want to ferret out a little bit of this overly nervous. Talk to me about that; tell me what you seen?

A. Shaking, shaking, not being able to sit still; you could see their corroded [sic] artery kind of pulsating, and then the eye contact.

Q. Wouldn't make any eye contact?

A. They wouldn't make any eye contact.

{¶ 6} For his safety, Shafer separated Rice from his passenger by placing Rice in the back seat of Shafer's cruiser. Rice told Shafer that they left Saturday (it was now just after midnight on Tuesday) to go to Ypsilanti, Michigan for his grandfather's birthday. Shafer then went back to Rice's car and talked to the passenger. The passenger told Shafer that they had left Monday morning to go to Ypsilanti to show off Rice's car to his grandmother. The passenger was still acting "overly nervous, shaking, not being able to sit still, not making eye contact." Shafer got the passenger's driver's license to run it through the LEADS and NCIC data bases.

{¶ 7} With nothing yet coming back on the car registration, Rice and his passenger

acting extremely nervous, and their stories being in substantial conflict, Shafer called for a drug sniffing dog. Shafer testified that he did this about fifteen minutes into the stop. A cruiser video that began when the stop was initiated was not available at the hearing, but was ultimately admitted in evidence without objection. It discloses that Shafer called for the dog about thirteen minutes into the stop, which began at 12:01 a.m.

{¶ 8} The dog arrived at 12:33, and alerted, more or less immediately, at 12:34. The search began at 12:36.[1] The search resulted in the seizure of oxycontin. Rice was arrested.

## II. The Course of Proceedings

{¶ 9} Rice was charged by indictment with Possession of Oxycontin, in violation of R.C. 2925.11(A), (C)(1)(c), a felony of the second degree. He moved to suppress both the evidence obtained as the result of the search and seizure, and statements he made. After a hearing, the trial court initially overruled the motion to suppress in its entirety, but later amended its decision to suppress the statements Rice made after he was arrested, but before he executed a waiver of rights at 1:45 in the morning at the Sheriff's Department.

{¶ 10} Rice then pled no contest, was found guilty, and was sentenced to prison for two years, a six-month driver's license suspension, and was ordered to pay costs and restitution. From his conviction and sentence, Rice appeals, assigning as his sole assignment of error:

> THE TRIAL COURT ERRED IN HOLDING THAT THE TROOPER WAS JUSTIFIED IN APPROACHING, STOPPING AND SEARCHING DEFENDANT'S VEHICLE, IN VIOLATION OF HIS FOURTH AND FOURTEENTH AMENDMENT RIGHTS.

---

[1] These times are all based on the cruiser video, which we have reviewed.

### III.   Trooper Shafer Had a Reasonable, Articulable Suspicion

### of Criminal Activity, Justifying a Brief Investigative Stop

{¶ 11}   Rice first argues that State Trooper Shafer lacked a reasonable, articulable suspicion to justify the initial stop.   In a case Rice cites, *State v. Andrews*, 57 Ohio St.3d 86, 88, 565 N.E.2d 1271 (1991), the Supreme Court of Ohio upheld an investigative stop where a suspect was observed running away from the direction of a police cruiser while alone in a high-crime area at night.   Based upon these facts as viewed through the stopping police officer's twelve and a half years experience on the police force, the Supreme Court concluded that the officer had a reasonable suspicion that the defendant in that case was engaged in criminal activity, even though the officer could have had no idea what specific criminal activity the defendant might have been engaged in.

{¶ 12}   In the case before us, Shafer had eleven years experience in law enforcement, including training in "criminal indicators."   Shafer based his articulated suspicion that Rice was engaged in criminal activity upon four facts.   One of these was the fact that Rice's car was originally parked "the wrong way," facing out of the parking space.   Shafer testified that in his experience drivers of stolen cars will park that way in order to avoid having the car's registration checked.   Another fact was that Rice seemed to be trying to avoid Shafer, by pulling out of a parking spot each time that Rice, in his marked cruiser, drew near.   A third fact was that Rice drove north in the southbound parking lot, despite the fact that the natural flow of traffic would be from the entrance from I-75, to the north, to the exit back to I-75, to the south.   The fourth fact was that dispatch was not returning registration information.   Shafer testified that this could be the result of the registration (evidently a temporary tag) being fake.

{¶ 13}   We tend to discount the third basis: that Rice drove from one parking spot north

to another in the rest area. Shafer acknowledged that there were no one-way signs in the parking area, and that Rice might have wanted to re-park closer to the restrooms and vending area. But in our view, the other three bases, taken in their totality, supported a reasonable, articulable suspicion of criminal activity, justifying a brief investigative stop, especially when viewed through the prism of Shafer's experience in law enforcement, which the Supreme Court of Ohio acknowledged as a legitimate consideration in *State v. Andrews, supra*.

**IV.   Under the Circumstances, the Prolongation of the Stop for About Twenty Minutes to Allow a Drug Sniffing Dog to Arrive Was Not Unreasonable**

{¶ 14}   As an initial matter, the State argues that Rice waived any claim based upon the drug sniffing dog, because he indicated at the outset of the suppression hearing that he had no issue in that regard. We conclude that the State has misconstrued Rice's position at the suppression hearing. That position was clarified as follows:

> MR. KENDELL [representing the State]: So I'm going to take the evidence up to the K-9 point, and then I'm going to skip to the interview, Your Honor.
>
> THE COURT:   So the – the length of the – oh well –
>
> MR. KENDELL: I, I – when I say length of time, the length of time of the stop before the K-9 arrived.
>
> THE COURT: Okay.   Is that –
>
> MR. KENDELL: That's what I think we're concentrating on.
>
> MR. MERRIT[T] [representing Rice]: That's correct.

THE COURT: So the, the length of time before the K-9 arrived is an issue, but the sniff and what happened after the sniff as far as any search or seizure related to the sniff – that's not an issue, but [t]he interrogation of the defendant at any point during the process is an issue?

MR. KENDELL: Yes sir.

MR. MERRITT: Yes Your Honor.

THE COURT: Okay.

MR. KENDELL: That's my understanding.

{¶ 15}   Based upon the foregoing exchange, we conclude that the reasonableness of the delay needed for the arrival and use of the drug sniffing dog was an issue at the suppression hearing, and Rice has preserved that issue for review on appeal.

{¶ 16}   From our review of the cruiser video, it appears that the stop commenced at 12:01 a.m., the drug sniffing dog was called for at 12:14 a.m., the dog arrived at 12:33 a.m., the dog alerted at 12:34 a.m., and the search commenced at 12:36 a.m.   There is some inconsistency in the record concerning the sequential relationship of the eventual return of the registration information showing that Rice was, in fact, the owner of the car he was driving.   At one point, Shafer testified that his attempt to verify the ownership of the vehicle and his attempt to obtain the criminal histories of Rice and his passenger were still ongoing when the drug sniffing dog arrived:

A.   The dog arrived approximately thirty to forty minutes after my initial traffic [sic] stop.

> Q. Okay and what were you doing during that thirty to forty minutes. You got us up to the criminal history check. Were you still doing that when the dog arrived, or did you – did you go on to something else?
>
> A. No I was still trying to verify the ownership of the vehicle.
>
> Q. Okay.
>
> A. And then still waiting on the case criminal history.
>
> Q. Okay and that was still in process when the K-9 unit arrived?
>
> A. That's correct.

{¶ 17} At another point, Shafer testified that the registration to the car came back "probably five minutes" before the search. Five minutes before the search would have been 12:31 a.m., which would have been before the arrival of the drug sniffing dog at 12:33 a.m. As will be seen, we conclude that this discrepancy is not critical.

{¶ 18} In a case involving a sobriety checkpoint, we have concluded that there may be a continuum within which the extent of permissible police intrusion into Fourth Amendment rights is proportional to the degree of particular, individualized suspicion of criminal activity:

> The type of stop utilized by the police in the case before us, which began as a brief initial stop and developed into a more intrusive stop only based upon particular, individualized suspicion acquired from information gathered through the initial stop, is not only consistent with the Fourth Amendment's restriction against unreasonable searches and seizures, it is exactly the kind of stop that should be encouraged, in which a principled balance has been struck between the need to discourage drunk driving and the right of the traveling public to be secure from unreasonable police interference.

*State v. Eggleston*, 109 Ohio App.3d 217, 227, 671 N.E.2d 1325, 1331 (2d Dist.1996).

{¶ 19}   This principle was cited approvingly by the Supreme Court of Ohio in *State v. Robinette*, 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (1997):

> If during the initial detention to ask the contraband question, the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual.  For example, at a sobriety checkpoint an officer who detects slurred speech would be justified in detaining the individual to perform a field test.  *State v. Eggleston* (1996), 109 Ohio App.3d 217, 671 N.E.2d 1325.

{¶ 20}   In the case before us, the initial stop led to a reasonable decision to separate Rice and his passenger for officer safety.   Based upon our review of the cruiser video, there was little delay, if any, while Shafer ascertained Rice's story about where he was going, and why, and his passenger's story, all the while attempting to run Rice's driver's license.   These two stories were in substantial conflict, which Shafer, based upon his experience, reasonably took to be an indicator of criminal activity, justifying, along with the extreme nervousness of Rice and his passenger (which Shafer described in detail), some additional delay to arrange for the arrival of a drug sniffing dog.

{¶ 21}   When Shafer called for the drug sniffing dog, at 12:14, just thirteen minutes into the stop, he had all the original bases for the stop: the fact that Rice's car was originally parked so that the temporary tag was not visible, the fact that the temporary tag number was not returning registration information (a possible indicator of a faked temporary tag), and the fact that Rice

seemed to be trying to avoid Shafer. In addition, Shafer had the extreme nervousness of Rice and his passenger, and the fact that their stories about when they had left Kentucky and why they were going to Ypsilanti were seriously in conflict. One possible construction of Shafer's testimony at the hearing is that he found out that the car was registered in Rice's name, as owner, about two minutes before the arrival of the drug sniffing dog. Another possible construction is that Shafer did not find this out until after the dog had alerted on the car. Either way, we conclude that Shafer had enough suspicion of criminal activity to justify the additional twenty minutes of investigative detention that elapsed between the time he called for the drug sniffing dog at 12:14 a.m. and the time it alerted on the car at 12:34 a.m. The additional intrusion represented by the additional twenty minutes' delay was proportionate to the enhanced suspicion resulting from the extreme nervousness and inconsistent stories when Rice and his passenger were stopped.

{¶ 22} We conclude that the delay for the arrival of the drug sniffing dog was not unreasonable under the totality of the circumstances. Rice's sole assignment of error is overruled.

## V.   Conclusion

{¶ 23} Rice's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

GALLAGHER, J., concurs.

HALL, J., concurring:

I concur with Judge Fain's opinion for the court in virtually all respects but write separately to indicate that I would not discount the fact that the defendant was driving the wrong way at the rest area. Even if such action is not a statutory traffic violation, driving the opposite direction in an interstate rest area, in my view, is highly unusual, potentially dangerous, and can be added as part of the mix in the trooper's reasonable suspicion of criminal activity.

. . . . . . . . . . . . .

(Hon. Eileen A. Gallagher, Eighth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Anthony E. Kendell
Jennifer S. Getty
Hon. Christopher Gee