[Cite as *State v. King*, 2020-Ohio-3065.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. WD-19-013

    Appellee                               Trial Court No. 2018CR0149

v.

Kyren Tavior King                          **DECISION AND JUDGMENT**

    Appellant                             Decided:  May 22, 2020

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} Appellant, Kyren King, appeals the judgment of the Wood County Court of
Common Pleas, sentencing him to five years in prison following his conviction for two
counts of trafficking in drugs and one count of trafficking in marijuana.

## A. Facts and Procedural Background

{¶ 2} On June 7, 2018, appellant was indicted on one count of trafficking in marijuana in violation of R.C. 2925.03(A)(2) and (C)(3)(c), a felony of the first degree, one count of trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(2)(c), a felony of the fourth degree, one count of possession of marijuana in violation of R.C. 2925.11(A) and (C)(3)(c), a felony of the fifth degree, one count of possession of cocaine in violation of R.C. 2925.11(A) and (C)(4)(e), a felony of the first degree, one count of possession of drugs in violation of R.C. 2925.11(A) and (C)(2)(b), a felony of the fourth degree, and one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2) and (C)(4)(f). The indictment stemmed from an incident that occurred on March 17, 2018, in which appellant was found with drugs in his possession during the course of an OVI checkpoint.

{¶ 3} Appellant entered a plea of not guilty, and the matter proceeded through pretrial discovery and motion practice. On July 26, 2018, appellant filed a motion to suppress, arguing that the OVI checkpoint at which he was apprehended was not conducted lawfully. Specifically, appellant asserted that the "issue is whether the trooper properly conducted the OVI checkpoint and whether the trooper improperly used individual discretion in selecting the Defendant's vehicle, which contained four African American males, for a search."

{¶ 4} On September 21, 2018, a hearing on appellant's motion to suppress was held. At the hearing, Trooper Codi Williams of the Ohio State Highway Patrol testified.

2.

After reciting his credentials, Williams testified regarding the Highway Patrol's policy and procedures regarding OVI checkpoints. According to Williams, the Highway Patrol's manual contains a section on OVI checkpoints that articulates the time and location at which such checkpoints are to be conducted. As to the selection of time and place, the Highway Patrol considers the statistical history of OVI crashes, and selects locations within a three-mile radius of high-crash areas. Additionally, Williams testified that the policy requires three media releases announcing the OVI checkpoint to the public before the checkpoint is conducted. Williams indicated that the three required media releases were issued in this case prior to the OVI checkpoint, and said releases were submitted at the suppression hearing as state's exhibit No. 4.

{¶ 5} As to the manner in which OVI checkpoints are conducted, Williams testified: "We check every vehicle that comes through unless the line commander tells us otherwise, such as if traffic is heavily backing up to the point of where it's going to be a safety concern for the people that are driving through – such as getting stuck in an intersection and whatnot." Williams confirmed that every OVI checkpoint conducted by the Highway Patrol follows the foregoing policies and procedures.

{¶ 6} Williams was a participant in the OVI checkpoint that was conducted in this case on March 17, 2018. With respect to this particular OVI checkpoint, Williams indicated that the date was selected because it was St. Patrick's Day, a day which, according to Williams' past experience, is commonly associated with drinking and driving. The checkpoint occurred at a predetermined area near the campus of Bowling

3.

Green State University, at the intersection of South College Avenue and East Wooster Street. This location was selected based upon prior "fatal injury and property crashes," and was described by Williams as the location in Bowling Green with "the majority of bars." According to state's exhibit No. 3, a report from the Ohio State Highway Patrol Office of Planning & Finance – Statistical Analysis Unit, there were 93 OVI-related crashes within the three-mile radius surrounding the site of the OVI checkpoint.

{¶ 7} When asked to describe how this particular checkpoint was conducted, Williams indicated that there were approximately 12 "line checkers" for vehicles traveling eastbound and westbound on East Wooster Street. If a line checker detected any criminal activity, including the odor of alcohol or marijuana, during the initial stop, that vehicle would then be directed to a "divergent area."

{¶ 8} During its direct examination of Williams, the state introduced a "Sobriety Checkpoint Checklist" as state's exhibit No. 2. According to the checklist, all vehicles were to be stopped and checked by officers, unless a deviation from that rule was approved by the line commander. The checklist required documentation of the time and reason for said deviation. According to Williams, the OVI checkpoint in this case was conducted in a manner consistent with the procedures set forth on the Highway Patrol's checklist.

{¶ 9} During the course of the OVI checkpoint, Williams encountered appellant. At the time, appellant was a rear passenger in a vehicle that drove through the OVI checkpoint and was stopped. As Williams approached the vehicle, the driver rolled the

window down, and Williams testified that he "smelled an odor of raw marijuana coming from the passenger compartment of the vehicle." Williams asked the driver about the odor, and the driver responded that "he had nothing in the vehicle that he was aware of." Due to the odor of marijuana, Williams "asked each of the individuals to get out of the vehicle and [another officer] got inside the vehicle and drove it to the divergent area for [Williams] so [the officers] could get out of the roadway."

{¶ 10} On cross-examination, Williams was asked how the officers conducting the checkpoint determined which cars to stop, to which he responded: "We stop each vehicle that comes through unless * * * other reasons such as – a lot of vehicles clogging up the road to where it's getting backed up into an intersection or all of the way down the road. Obviously, it's just going to be a safety hazard." Williams went on to reiterate that every vehicle is stopped unless he is told otherwise by his lieutenant. He explained: "[a]t one point, I know there [were] a lot of commercial vehicles coming through to where it was clogging up the road quite a bit. Lieutenant Burgos let us know, "Let's go ahead and allow traffic to flow through a little bit so it's not * * * so backed up and then we can continue on checking each car."

{¶ 11} At the conclusion of Williams' testimony, the state rested. Appellant did not call any witnesses, so the matter proceeded to closing statements. Following closing statements, the trial court took the matter under advisement.

{¶ 12} On October 17, 2018, the trial court issued its decision on appellant's motion to suppress. In its decision, the trial court found that Williams exercised no

5.

individual discretion in stopping the vehicle in which appellant was a passenger during the course of the OVI checkpoint. Relying upon Williams' testimony, the court found that Williams only stopped the vehicle because it was the next vehicle in line, and that all vehicles were stopped unless they were allowed to pass through for safety concerns. The court concluded that the Highway Patrol followed "established policies and procedures and no part was left to the discretion of the line checkers who were manning the checkpoint." As such, the trial court denied appellant's motion to suppress.

{¶ 13} On December 12, 2018, the matter proceeded to a two-day jury trial. Following jury selection and opening statements, the state called Kyler Famble as its first witness. Famble, appellant's schoolmate and friend, was the driver of the vehicle that was stopped at the OVI checkpoint on March 17, 2018. According to Famble, he picked up three friends earlier in the day from Cincinnati; appellant, George Daniels, and Jerel Horton. Appellant and another friend, George Daniels, were each carrying a bag when they approached Famble's vehicle prior to the OVI checkpoint. Daniels had a denim blue teal backpack, and appellant had a blue Northwest cheerleading book bag bearing the name of appellant's girlfriend, Kayleigh. Famble identified state's exhibit No. 3 as appellant's bag. Famble stated that he opened the trunk and appellant and Daniels placed the bags inside. Famble did not detect any odor emanating from the bags at the time. Famble acknowledged that he, too, had a black Nike book bag that he used for school.

{¶ 14} After picking up his friends, Famble drove to Toledo to a residence of another friend, Tyler King. Upon arrival, Famble and Horton removed their luggage

6.

from Famble's trunk. Sometime later, the group of men left King's residence to go to the mall. While at the mall, Famble observed appellant carrying a "bundle of cash with him." After completing their shopping, the group returned to King's residence and prepared to go out to a "social function" in Bowling Green later that evening.

{¶ 15} After leaving King's residence, the group drove to Bowling Green, where they were ultimately stopped at the OVI checkpoint at the intersection of South College Avenue and East Wooster Street, leading to the discovery of marijuana, cocaine, and Alprazolam pills in the trunk of Famble's vehicle. Famble testified that he did not smell any marijuana coming from appellant's bag prior to the stop. Famble later testified that the narcotics discovered in his trunk belonged to appellant, a conclusion he drew from his observation of police removing the narcotics from appellant's bag during the OVI checkpoint.

{¶ 16} On cross-examination, Famble stated that he was certain that he did not confuse appellant's bag with Daniel's bag, despite the fact that they were both blue. When questioned about the charges that were filed against him following this incident, Famble indicated that the charges were dismissed because the prosecutor believed Famble to be innocent of any wrongdoing.

{¶ 17} As its second witness, the state called Horton to the stand. Like Famble, Horton and appellant have been friends since they attended middle school together. Horton corroborated Famble's testimony that he and Famble took their bags into King's residence upon arrival. Horton also testified that he was not paying attention to any other

7.

bags, but denied having brought the bag that Famble identified as appellant's bag, and further denied bringing any narcotics with him on the trip.

{¶ 18} Following Horton's testimony, the state called King as its third witness. King and appellant have known each other since they were in eighth grade. Upon the group's arrival to King's residence, King observed that each man "brought their own personal belongings." King was able to confirm that state's exhibit No. 3 was the bag that appellant brought with him to King's residence. According to King, appellant attempted to bring his bag into the residence, but King directed him to return it to Famble's vehicle because he did not like the "strong marijuana smell" that was emanating from the bag.

{¶ 19} On cross-examination, defense counsel questioned King as to whether he received a dismissal of charges in exchange for cooperation in the present case. King replied in the negative, insisting that "I just told the truth. I came in and told the truth of what happened. That was it. * * * I didn't make no agreement. I just gave them my knowledge – told the truth."

{¶ 20} As its fourth witness, the state called Highway Patrol criminalist, Emily Bocook, to the stand. As a criminalist, Bocook "analyze[s] evidence for the absence or presence of controlled substances, write[s] reports on [her] findings, and [testifies] to those findings." As it relates to this case, Bocook analyzed the materials police seized from appellant's bag and prepared a report, which was admitted into evidence as state's exhibit No. 10. Pursuant to her analysis, Bocook determined that the materials seized by

8.

police included 25.949 grams of Alprazolam, a schedule IV substance, an unspecified weight of Tetrahydrocannabinol (THC), a schedule I substance, an aggregate total of 316.461 grams of marijuana, a schedule I substance, and 33.987 grams of cocaine hydrochloride, a schedule II substance.

{¶ 21} As its fifth and final witness, the state called trooper Williams to the stand. Williams explained that he was the officer who stopped Famble's vehicle at the OVI checkpoint on March 17, 2018. Williams testified that Famble, Daniels, King, Horton, and appellant were in the vehicle at the time of the stop. As Famble approached Williams in his vehicle, he lowered his window "just a tiny bit" and Williams stated that he smelled an odor of raw marijuana coming from the passenger compartment of the vehicle. Williams ordered Famble to drive to the divergent area that the officers had setup for the OVI checkpoint.

{¶ 22} Once Williams secured the vehicle in the divergent area, he asked all of the passengers to exit the vehicle and searched the vehicle. Upon looking in the trunk of the vehicle, Williams "located the bag that contained all the contraband." Williams confirmed that the bag containing the contraband was the bag that had previously been marked state's exhibit No. 3. When Williams looked inside the bag, he found

> a large amount of marijuana in a plastic bag. [There were] two different
> bags containing Alprazolam pills, one was whole pills, the other was
> crushed up fragments that appeared to be the same pill. There was a bag of

9.

cocaine, a tiny piece of paper with white residue inside, a digital scale, and two marijuana edibles packages – THC edibles.

{¶ 23} Based upon his prior experience as a drug interdiction officer, Williams was able to identify the presence of marijuana from the odor emanating from the bag. Williams testified that the large amount of narcotics present inside the bag, coupled with the digital scale that was recovered, was not indicative of personal use, but instead suggested narcotics trafficking. Moreover, Williams searched appellant after finding the narcotics in his bag, and discovered a "thick wad of cash in his pocket" comprised of bills of different amounts, which Williams testified was typically associated with drug trafficking in his experience.

{¶ 24} At the conclusion of Williams' testimony, the state rested. Appellant then moved for acquittal under Crim.R. 29, arguing only that the evidence that was presented should have been suppressed as requested in his previously-denied motion to suppress and, absent such evidence, the state introduced insufficient evidence to support the charges contained in the indictment. Upon consideration, the trial court denied appellant's Crim.R. 29 motion, finding that the state's evidence, consisting of testimony from several of appellant's friends, established that the narcotics discovered in the trunk of Famble's vehicle belonged to appellant.

{¶ 25} Once the trial court denied appellant's Crim.R. 29 motion, the defense rested. The court instructed the jury, and the parties provided closing arguments.

10.

Following deliberations, the jury found appellant guilty of all charges contained in the indictment. Thereafter, the court set the matter for sentencing.

{¶ 26} At sentencing, the trial court discussed its consideration of the seriousness and recidivism factors under R.C. 2929.12 with the state and appellant's defense counsel. Thereafter, the court heard statements in mitigation, and discussed issues regarding merger of certain offenses. Ultimately, the parties agreed that the possession and trafficking charges merged with one another, and the state elected to proceed on the three trafficking counts.

{¶ 27} Upon consideration, the trial court voiced its concern over appellant's lack of remorse at sentencing, noting appellant's insistence that he did not commit the crimes with which he was charged. Thereafter, the trial court imposed prison terms of five years for trafficking in drugs (cocaine), 17 months for trafficking in marijuana, and 17 months for trafficking in drugs (Alprazolam). The court ordered the sentences served concurrently for a total prison term of five years. In its sentencing entry, the trial court stated that "the purposes and principles of sentencing as well as the seriousness and recidivism factors were carefully reviewed."

{¶ 28} Thereafter, appellant filed a timely notice of appeal.

### B. Assignments of Error

{¶ 29} On appeal, appellant asserts the following assignments of error for our review:

1. The trial court erred when it determined that the sobriety checkpoint used to stop appellant was constitutional under the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 14 of the Ohio Constitution.

2. The jury's verdict was against the manifest weight of the evidence presented at trial.

3. The trial court committed error to the prejudice of appellant by imposing the costs of prosecution without consideration of appellant's present or future ability to pay.

## II. Analysis

### A. Motion to Suppress

{¶ 30} In his first assignment of error, appellant argues that the trial court erred when it denied his motion to suppress after finding that the OVI checkpoint conducted in this case was constitutional. Appellant only challenges the execution of the OVI checkpoint; he does not independently challenge the reasonable suspicion garnered from Williams' detection of an odor of marijuana or Williams' subsequent search of Famble's vehicle.

{¶ 31} Concerning appellate review of a trial court's decision on a motion to suppress, which involves mixed questions of law and fact, the Supreme Court of Ohio has held:

When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶ 32} In *Michigan v. Sitz*, 496 U.S. 444, 453, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the United States Supreme Court applied a three-part balancing analysis that was derived from its decision in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) to the state's use of a highway sobriety checkpoint. In applying the test, we are to balance "the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped." *Sitz* at 455. In applying the foregoing test, the court in *Sitz* held that the sobriety checkpoint at issue was constitutional.

{¶ 33} In reaching its decision, the court noted the magnitude of the drunken driving problem and the state's interest in eradicating it. *Id.* at 451. Further, the court found that the intrusion to motorists who are stopped at OVI checkpoints "is slight." *Id.*

13.

Finally, the court concluded that the particular sobriety checkpoint at issue in *Sitz* could be reasonably said to advance the state's interest in preventing drunken driving. *Id.* at 455. On the question of the checkpoint's effectiveness at preventing drunken driving, the court distinguished between checkpoints at which vehicles are stopped randomly from those, like the one at issue in the present case, in which all vehicles are stopped, finding the latter to be permissible. *Id.*

{¶ 34} Since the United States Supreme Court issued its decision in *Sitz*, "a majority of state courts have followed the balancing analysis and have concluded that roadblocks may survive constitutional scrutiny if they are operated under guidelines which minimize intrusiveness and limit officers' discretion." *State v. Hall*, 5th Dist. Ashland No. 03-COA-064, 2004-Ohio-3302, ¶ 15, citing *State v. Downey*, 945 S.W.2d 102, 108, n. 6 (Tenn.Sup.Ct.1997). Ohio is among the majority of jurisdictions who have upheld the constitutionality of OVI checkpoints. *Id.* at ¶ 17, citing *State v. Eggleston*, 109 Ohio App.3d 217, 671 N.E.2d 1325 (2d Dist.1996) and *State v. Bauer*, 99 Ohio App.3d 505, 651 N.E.2d 46 (10th Dist.1994).

{¶ 35} Here, appellant does not challenge the constitutionality of the OVI checkpoint under the three-part test set forth in *Sitz*. Instead, appellant asserts that the checkpoint was unconstitutional under the following guidelines that were originally set forth by the Iowa Supreme Court and later referenced by the Second District:

"* * * Where there is no consent, probable cause, or *Terry*-type reasonable and articulable suspicion, a vehicle stop may be made only where there

minimally exists (1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to 'show * * * the police power of the community;' and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria."

*State v. Goines*, 16 Ohio App.3d 168, 170-171, 474 N.E.2d 1219 (2d Dist.1984), quoting *State v. Hilleshiem*, 291 N.W.2d 314, 318 (Iowa 1980).

{¶ 36} The state asserts that the Ohio Supreme Court has not adopted the guidelines referenced in *Goines*, and therefore argues that these guidelines are not controlling in this case. We need not reach this issue, however, because our conclusion in this case remains the same even if we apply the guidelines articulated in *Goines*.

{¶ 37} Appellant acknowledges the state's compliance with the first three guidelines in *Goines*, but argues under the fourth guideline that the Highway Patrol's procedures relating to the OVI checkpoint in this case were "arbitrary in that not every vehicle that passes through the sobriety checkpoint is stopped." Appellant's contention in this regard is premised upon "the fact that not every vehicle that [entered] the [OVI] checkpoint [was] stopped."

15.

{¶ 38} In its decision, the trial court expressly rejected appellant's argument that the OVI checkpoint in this case was conducted in an arbitrary fashion. The court found that the OVI checkpoint was carried out with "military-like precision." Having reviewed the transcript of the suppression hearing, we agree.

{¶ 39} During his testimony at the hearing on appellant's motion to suppress, Williams articulated in detail the Highway Patrol's policy and procedures regarding OVI checkpoints. Taken together, these policies and procedures (media notification, selection of time and place, manner in which the checkpoints are to be conducted, etc.) are obviously designed to render the OVI checkpoints conducted by the Highway Patrol neutral and impartial. Indeed, Williams indicated that officers conducting OVI checkpoints under these policies and procedures check *every* vehicle that comes through unless the line commander instructs the officers to allow traffic to flow through the checkpoint for safety reasons, at which point *every* vehicle is allowed to pass through uninspected until the safety issue is resolved.

{¶ 40} Contrary to appellant's contention that the OVI checkpoint in this case was conducted in an arbitrary fashion, Williams stated that every vehicle was stopped unless he was told otherwise by his lieutenant, which happened in this case when "a lot of commercial vehicles [were] coming through [the OVI checkpoint] to where it was clogging up the road quite a bit." This procedure, known as "flushing," has previously been reviewed and upheld by Ohio courts. *See Hall*, *supra*, 5th Dist. Ashland No.

03-COA-064, 2004-Ohio-3302, at ¶ 24; *see also Eggleston*, *supra*, 109 Ohio App.3d at 225-226, 671 N.E.2d 1325 and *Bauer*, *supra*, 99 Ohio App.3d at 511, 651 N.E.2d 46. Notably, the record is devoid of any indication as to when Famble's vehicle was stopped in relation to the flushing that occurred during this OVI checkpoint, and appellant does not contend that his vehicle should have been passed through during the flushing.

{¶ 41} In sum, the testimony provided by Williams demonstrates that he had no individual discretion to determine whether to stop the vehicle in which appellant was a passenger. The officers conducting the stop were not given individual decision-making authority over which vehicles would be required to stop and which vehicles would be allowed to pass through. Rather, *all* vehicles were stopped unless safety concerns arose, at which point *all* vehicles were allowed to pass through.

{¶ 42} On the facts found by the trial court, which we are required to accept since they are supported by competent, credible evidence, we conclude that the OVI checkpoint here was conducted according to carefully formulated standards and neutral criteria. Therefore, applying, for the sake of argument, the guidelines set forth in *Goines*, we find no merit to appellant's contention that the OVI checkpoint in this case was carried out in an arbitrary fashion such that it ran afoul of the constitutional protections guaranteed by the Fourth Amendment. Accordingly, appellant's first assignment of error is not well-taken.

17.

## B. Manifest Weight

{¶ 43} In his second assignment of error, appellant argues that the jury's verdict was against the manifest weight of the evidence.

{¶ 44} When reviewing a manifest weight of the evidence claim, the appellate court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220. A new trial should only be granted in the "exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), citing *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶ 45} In the present case, appellant was convicted of one count of trafficking in marijuana in violation of R.C. 2925.03(A)(2) and (C)(3)(c), one count of trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(2)(c), one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2) and (C)(4)(f), one count of possession of marijuana in violation of R.C. 2925.11(A) and (C)(3)(c), one count of possession of cocaine in violation of R.C. 2925.11(A) and (C)(4)(e), and one count of possession of drugs in violation of R.C. 2925.11(A) and (C)(2)(b). Ohio's trafficking statute, R.C. 2925.03, provides, in relevant part:

18.

(A) No person shall knowingly do any of the following:

* * *

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(2) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule III, IV, or V, whoever violates division (A) of this section is guilty of trafficking in drugs. The penalty for the offense shall be determined as follows:

* * *

(c) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, trafficking in drugs is a felony of the fourth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term for the offense. If the amount

of the drug involved is within that range and if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in drugs is a felony of the third degree, and there is a presumption for a prison term for the offense.

\* \* \*

(3) If the drug involved in the violation is marihuana or a compound, mixture, preparation, or substance containing marihuana other than hashish, whoever violates division (A) of this section is guilty of trafficking in marihuana.  The penalty for the offense shall be determined as follows:

\* \* \*

(c) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds two hundred grams but is less than one thousand grams, trafficking in marihuana is a felony of the fourth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.  If the amount of the drug involved is within that range and if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in marihuana is a felony of the third degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

\* \* \*

(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of trafficking in cocaine. The penalty for the offense shall be determined as follows:

* * *

(f) If the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine and regardless of whether the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in cocaine is a felony of the first degree, and the court shall impose as a mandatory prison term a first degree felony mandatory prison term.

{¶ 46} Ohio's possession statute, R.C. 2925.11, provides, in relevant part:

(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(2) If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule III, IV, or V, whoever

violates division (A) of this section is guilty of possession of drugs. The penalty for the offense shall be determined as follows:

\* \* \*

(b) If the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, possession of drugs is a felony of the fourth degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

\* \* \*

(3) If the drug involved in the violation is marihuana or a compound, mixture, preparation, or substance containing marihuana other than hashish, whoever violates division (A) of this section is guilty of possession of marihuana. The penalty for the offense shall be determined as follows:

\* \* \*

(c) If the amount of the drug involved equals or exceeds two hundred grams but is less than one thousand grams, possession of marihuana is a felony of the fifth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

\* \* \*

(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine. The penalty for the offense shall be determined as follows:

\* \* \*

(e) If the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine, possession of cocaine is a felony of the first degree, and the court shall impose as a mandatory prison term a first degree felony mandatory prison term.

{¶ 47} At trial, the state introduced evidence to establish all of the elements of the trafficking and possession statutes recited above. As to appellant's possession of marijuana, cocaine, and drugs under R.C. 2925.11(A), the state introduced unrefuted evidence from several of appellant's friends establishing that appellant was the owner of the cheerleading bag containing marijuana, cocaine, and Alprazolam pills. The testimony further establishes that appellant was the only individual who exercised dominion or control over the bag during the relevant period.

{¶ 48} Additionally, under R.C. 2925.03(A)(2), appellant's transport of the drugs was obvious given the fact that the drugs were found stowed in a bag in the trunk of Famble's car after the group of men arrived in Bowling Green from Cincinnati by way of Toledo, a drive of approximately three hours.

{¶ 49} Appellant's intent to sell the drugs under R.C. 2925.03(A)(2) was also established by the state's evidence. According to Williams' testimony, the amount of drugs present inside appellant's bag indicated that the drugs were not being used for individual personal use. Coupled with the digital scale that was recovered from the bag, the large quantity of drugs found in the bag was indicative of narcotics trafficking. Additionally, Williams testified that his search of appellant revealed a "thick wad of cash in his pocket" comprised of bills of different amounts, which is typically associated with drug trafficking in Williams' experience.

{¶ 50} The drugs that were recovered from appellant's bag were subsequently analyzed by Bocook and found to contain 25.949 grams of Alprazolam, a schedule IV substance, 316.461 grams of marijuana, a schedule I substance, and 33.987 grams of cocaine hydrochloride, a schedule II substance. These amounts are sufficient to satisfy R.C. 2925.03(C)(2)(c) and 2925.11(C)(2)(b) with respect to the Alprazolam, R.C. 2925.03(C)(3)(c) and 2925.11(C)(3)(c) with respect to the marijuana, and R.C. 2925.03(C)(4)(f) and 2925.11(C)(4)(e) with respect to the cocaine.

{¶ 51} Taken together, the foregoing evidence supports the jury's verdict in this case. Appellant does not contest this notion. Rather, appellant argues that "the jury's verdict was based upon the nature of the charges against him and the generally shared societal view of dangerous and illegal drugs." However, appellant offers no evidence to support his argument, and points to nothing in the record to demonstrate that the state attempted to elicit convictions in this case based merely upon such a "generally shared

24.

societal view." On the contrary, our review of the record reveals that the state's evidence clearly and unequivocally established appellant's guilt of the crimes with which he was charged.

{¶ 52} Appellant also argues that the testimony provided by Famble, Horton, and King was "suspect because they all testified that their criminal charges had been dismissed." In so arguing, appellant acknowledges that each of these witnesses explained that their charges were dismissed only after it was determined that the cheerleading bag containing the drugs belonged to appellant. According to these witnesses, none of the dismissals were conditioned upon cooperation with law enforcement in this case. Nonetheless, appellant invites us to "assume that the dismissal of all of their charges was conditioned upon their cooperation in testifying against appellant." Such an assumption is baseless given the testimony in this case, and it runs afoul of the standard of review that this court is required to apply to the state's uncontroverted testimony.

{¶ 53} Upon our careful review of the entire record in this case, we find that there is competent, credible evidence supporting the jury's verdict. Accordingly, we cannot say that a manifest injustice occurred with appellant's conviction requiring us to reverse such conviction. This is not the exceptional case in which the evidence weighs heavily against appellant's conviction, nor is this a case in which the jury has clearly lost its way. Thus, we conclude that appellant's convictions are not against the manifest weight of the evidence, and we find appellant's second assignment of error not well-taken.

25.

## C. Costs

{¶ 54} In his third assignment of error, appellant argues that the trial court erred in imposing costs of prosecution without consideration of appellant's ability to pay such costs.

{¶ 55} On review by this court, we must determine whether the trial court's imposition of costs was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b); *State v. Farless*, 6th Dist. Lucas Nos. L-15-1060 and L-15-1061, 2016-Ohio-1571, ¶ 4, citing *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 30 ("An appellate court may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law.").

{¶ 56} In its sentencing entry, the trial court ordered that appellant is "ordered to pay the costs of this prosecution, including the jury trial." Appellant acknowledges that costs of prosecution are mandatory under R.C. 2947.23(A)(1)(a), which provides: "In all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs."

{¶ 57} In his brief, appellant challenges the trial court's imposition of non-mandatory costs, including the costs of confinement and assigned counsel. In order to impose these costs, the trial court must first affirmatively find that appellant has, or

26.

reasonably may be expected to have, the ability to pay such costs. *State v. Gray*, 6th Dist. Lucas No. L-15-1072, 2015-Ohio-5021, ¶ 21; *State v. Wymer*, 6th Dist. Lucas No.

**{¶ 58}** L-18-1108, 2019-Ohio-1563, ¶ 14.

**{¶ 59}** Notably, the trial court's sentencing entry does not mention any non-mandatory costs. Rather, the only costs referenced by the trial court in its entry, and therefore the only costs imposed in this matter, were the costs of prosecution, which are mandatory as set forth above. Since costs of prosecution must be imposed regardless of appellant's present or future ability to pay them, we find that the trial court's imposition of costs in this matter was not contrary to law.

**{¶ 60}** Accordingly, appellant's third assignment of error is not well-taken.

### III. Conclusion

**{¶ 61}** In light of the foregoing, the judgment of the Wood County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

27.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.